CENTRAL NATIONAL BANK IN CHICAGO, Plaintiff-Appellant and Cross-Appellee, *v.* FLEETWOOD REALTY CORPORATION *et al.*, Defendants-Appellees and Cross-Appellants.

First District (2nd Division) No. 81—647

Opinion filed October 26, 1982.

Sidley & Austin, of Chicago (Robert A. Downing, of counsel), for

appellant.

Kenneth C. Prince and Robert Tarnoff, both of Prince, Schoenberg, Fisher & Newman, Ltd., of Chicago, for appellee Executive Business Centre, Inc.

Paul Homer, Stephen C. Shamberg, and John M. Myers, all of Friedman & Koven, of Chicago, for other appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Central National Bank (CNB), lessee, commenced an action against Fleetwood Realty Corporation (Fleetwood), building manager, Chicago Title and Trust Company (CT&T) as trustee, lessor, and the then "unknown owners" to obtain, *inter alia*, specific performance of an option contained in its lease of space in an office building located at 200 West Monroe St., Chicago (Building). Subsequently, the 200 West Monroe Partnership (Partnership), trust beneficiary, and Executive Business Centre, Inc. (EBC), a tenant claiming an option similar to CNB's, among others, were allowed to intervene and to file a counterclaim. CNB added count II to its complaint seeking, *inter alia*, an order declaring that EBC's right to any option space be deemed subordinate to CNB's option rights as to all space becoming available in the Building. After trial, the circuit court entered judgment from which all parties appeal.

The principal issues raised in CNB's appeal include whether: the circuit court erred in determining that CNB's future rights to additional space are subject to the superior rights of EBC and other nonparty tenants under certain option language; and, the circuit court erred in not ordering that paragraph 3(d) of CNB's lease be incorporated into the leases to CNB of spaces in the building purportedly leased pursuant to CNB's option rights. On cross-appeal the main issues presented by defendants for review include whether: the circuit court erred in holding that CNB validly and effectively exercised its option for the option spaces; and, the circuit court erred in its rulings on defendants' defenses and claims based on CNB's leasing activities as *ultra vires* under the National Bank Act (12 U.S.C. sec. 21 *et seq.* (1976)). For the reasons given below, we affirm in part and reverse in part.

CT&T holds legal title to the Building under trust agreement No. 56000. The Partnership is an Illinois limited partnership which owns 100% of the beneficial interest in the CT&T trust. Fleetwood is a partnership, engaged, among other things, as managing agent for the

beneficiary of the trust. EBC is an Illinois corporation which leases and subleases space at the Building to individuals and businesses and provides them with secretarial services and conference facilities. Philip Teinowitz, Albert Rubenstein and Bernard Feinberg[1] were general partners of the Partnership, the only partners of Fleetwood, and the sole stockholders of EBC.

On May 23, 1972, CNB and CT&T executed a lease under which CNB rented over 100,000 square feet on the lower level and second to fifth floors of the Building. Paragraph 3(d) of the CNB lease granted CNB the option to lease additional space in the Building, provided, in part:

> "Not less than 240 days prior to the expiration of any lease of space in the building not included in this Lease,*** the Landlord shall serve notice on the Tenant of the termination of such Lease and the Tenant shall have the option to lease the space covered by the Lease so expiring by serving notice on the Landlord, within 30 days after the date of Landlord's said notice to Tenant, of Tenant's election to exercise such option. *** Notwithstanding the foregoing, any similar such option granted to any other tenant in the building shall be superior to the option granted to Tenant hereunder in respect of any space which is closer to or equidistant to such other tenant's major leasehold interest (measured vertically and horizontally) than it is to Tenant's major leasehold interest at the time."

On September 3, 1975, EBC and CT&T, as trustee, executed a lease for approximately 8,256 square feet of space on the 16th floor of the Building for a term ending September 30, 1980.

Jeffrey Wilson, CNB vice-president, testified that in early 1979 Rubenstein told him that he was having difficulty remortgaging the Building and asked CNB to relinquish its option rights. CNB refused. In April 1979, CNB was advised by an appraiser of real estate that the present value of CNB's option may approximate $3 million, given certain assumptions. In a memorandum dated November 13, 1979, Rubenstein indicated that he met with Wilson and William Smith, vice chairman of CNB, to see if they would relinquish their option rights and consent to a possible takeover of leased space they were not presently occupying. The memorandum further noted that: "The motivation for this visit resulted from Neil Bloom's comment that he would be willing to purchase 200 West Monroe for between $12 million and

---

[1]Feinberg died on September 28, 1980, while the action was pending and the co-executors of his estate have been substituted as defendants.

$12.5 million (equity) provided we could get rid of Central's 'right-of-first-refusal on all space.' My second motive was a result of a letter I received from Central National Bank last week indicating they were going to enter into a new lease with Illinois Bell Telephone at 200 West Monroe for a five-year period, and in today's market, I felt that we would probably do better with I.B.T. ourselves."

Barry Bass, a Fleetwood leasing agent, and Sol Krause, a Fleetwood building manager, both testified that after the CNB meeting they discussed with Rubenstein what could be done to limit or avoid CNB's option rights. Rubenstein's memorandum indicated that he, Bass and Krause believed they could give EBC a right of first refusal because of their 16th floor tenancy, which would take precedence over CNB's rights at least with respect to certain floors in the building. Leland Fay, a commercial real estate broker, testified that in early 1980 Teinowitz told him that he had made a "bad deal" in giving CNB rights which would take all of the upside potential out of the Building.

On January 23, 1980, Fleetwood sent a letter to CNB pursuant to paragraph 3(d) of the CNB lease that four spaces (option spaces) of specified square footage on the 11th, 15th and 16th floors of the Building would be available at certain specified times during 1980. The letter described the spaces by square footage on each floor and date of expiration of lease, and required a response by CNB within 30 days.

On February 21, 1980, CNB notified Fleetwood by certified mail of "its intention to exercise its rights under paragraph 3(d) of the Lease, *subject to inspection* by the Bank" of the option spaces. (Emphasis added.) William Smith testified that, after receipt of the notice of option space availability, he and Wilson went to the Building to attempt to identify them, but were unable to do so from a visual inspection of the floors and a limited inquiry of the existing tenants. Wilson essentially corroborated Smith's testimony.

On February 26, 1980, EBC and CT&T executed a lease renewal and amendment to the original EBC lease in which the parties agreed that the lease would be extended from September 30, 1980, to and including December 31, 1984. In addition, EBC was granted option rights, similar to the rights granted to CNB, not contained in the original EBC lease of 1975. According to Bass, the person in charge of overseeing EBC, the amendment was executed so that EBC would be able to acquire additional space on a competitive basis with CNB and any other tenant in the Building.

In March 1980, CNB requested twice, by way of certified mail,

that Fleetwood execute its leases for the option spaces offered by the January 23, 1980, letter and accepted by CNB. Fleetwood did not comply. Fleetwood's notification to EBC on March 14, 1980, of the availability of the four option spaces resulted in EBC's letter of March 18, 1980, which states that EBC "does hereby exercise the option to lease" the option spaces. Two days later, CT&T signed a lease with EBC for the subject spaces.

## I

The questions raised on cross-appeal will be considered first, since they deal with the validity of CNB's purported exercise of its option as to the four option spaces, a threshold issue.

Paragraphs 1, 2, 3 and 4, respectively, of the circuit court's March 5, 1981, judgment essentially found and ordered that: (1) CNB's exercise of its option was valid and effective; (2) EBC's lease of the option spaces dated March 20, 1980, was void and of no effect; (3) defendants, except EBC, were specifically directed to prepare and execute leases with CNB for the option spaces, similar to the existing CNB lease and otherwise comply with the terms of paragraph 3(d); and, (4) until defendants, except EBC, comply fully with paragraph 3 of the judgment, and until CNB's lease of the option spaces pursuant to paragraph 3 expires, defendants were enjoined from executing with anyone, other than CNB, leases for the option spaces.

Defendants contend first that CNB did not properly and timely exercise its option for the option spaces, claiming that: under paragraph 3(d) of the CNB lease, CNB had 30 days after notice within which to exercise its option or until February 22, 1980; and, CNB's February 21, 1980, letter to Fleetwood purporting to "exercise its rights under Paragraph 3(d) of the lease, subject to inspection by the Bank" was invalid and ineffective option exercise because it was conditional.

■■ ■ To be validly exercised, an acceptance must meet and correspond to the terms of the offer exactly. (*Morris v. Goldthorp* (1945), 390 Ill. 186, 195, 60 N.E.2d 857; *Farley v. Roosevelt Memorial Hospital* (1978), 67 Ill. App. 3d 700, 703, 384 N.E.2d 1352.) A qualification or condition made part of the acceptance will invalidate the acceptance. *Department of Public Works & Buildings v. Halls* (1966), 35 Ill. 2d 283, 286-87, 220 N.E.2d 167; *Morris v. Goldthorp; Seaberg v. American National Bank & Trust Co.* (1976), 35 Ill. App. 3d 1065, 1072-73, 342 N.E.2d 751. See also *Gaskins v. Walz* (1951), 409 Ill. 40, 45, 97 N.E.2d 798; *Kadansky v. Fickett* (1973), 54 Ill. 2d 14, 294 N.E.2d 262.

■ CNB's letter of February 21, 1980, purporting to exercise its option contained the proviso making the acceptance "subject to" its "inspection" of the space. Language such as "subject to," when used in contracts generally, engrafts a condition upon the parties' duty of performance and does not constitute a promise to perform.· In *Englestein v. Mintz* (1931), 345 Ill. 48, 61, 177 N.E.· 746, the supreme court construed these words, in a contract action, as follows:

"The words 'subject to,' used in their ordinary sense, mean 'subordinate to,' 'subservient to' or 'limited by.' There is nothing in the use of the words 'subject to,' in their ordinary use, which would even hint at the creation of affirmative rights."

To the same effect are *Interway, Inc. v. Alagna* (1980), 85 Ill. App. 3d 1094, 1099, 407 N.E.2d 615, *appeal denied* (1980), 81 Ill. 2d 592; *Urban Investment & Development Co. v. Maurice L. Rothschild & Co.* (1975), 25 Ill. App. 3d 546, 553-54, 323 N.E.2d 588 (concurring opinion); *Michelin Tires (Canada) Ltd. v. First National Bank* (1st Cir. 1981), 666 F.2d 673, 677; *Burgess Construction Co. v. M. Morrin & Son Co.* (10th Cir. 1975), 526 F.2d 108, 113; *Anderson v. Southwest Savings & Loan Association* (1977), 117 Ariz. 246, 248, 571 P.2d 1042, 1044.

Together with the foregoing must be considered the meaning of the word "inspection" as used by CNB in its asserted acceptance of the offer of option space. "Inspection" has a broader meaning than just viewing. It has been defined to include "examine carefully or critically, investigate and test officially, especially a critical investigation or scrutiny." *People v. Floom* (1977), 52 Ill. App. 3d 971, 974, 368 N.E.2d 410, and authorities therein cited and quoted.

Contrary to CNB's assertion that it neither introduced new terms nor made its acceptance conditional, but merely sought information directed toward performance of the contract (*Welsh v. Jakstas* (1948), 401 Ill. 288, 298, 82 N.E.2d 53; *Farley v. Roosevelt Memorial Hospital*), the clear import of the words "subject to inspection" is that an inspection will be forthcoming at some unspecified time, which must result satisfactorily to CNB before CNB deems itself bound. (See *Seaberg v. American National Bank & Trust Co.* (1976), 35 Ill. App. 3d 1065, 1072-73.) No standard, guide or other information is provided by which to measure the result of that inspection. Were we to assume, as CNB urges in effect, that the word "inspection" is interchangeable with the word "identification," the conclusion is the same. If the identification of the option spaces reveals to CNB any reason to decline the offer, it can do so having made the offer "subject" thereto. "Subject to inspection" or "identification" could mean that

CNB must be satisfied with such diverse elements as view, or physical condition, or configuration or similar attribute. Other considerations may include proximity to stairways, elevators, public lavatories, and width and location of public corridors. See *The Advertising Checking Bureau, Inc. v. Canal-Randolph Associates* (1981), 101 Ill. App. 3d 140, 427 N.E.2d 1039, *appeal denied* (1982), 88 Ill. 2d 549.

Nor is there implicit in CNB's claimed acceptance any suggestion as to the period of time within which CNB would make its "inspection" or "identification," or when it would make its acceptance final, or would make known to a lessor that its "inspection" or "identification" reveals to CNB that it does not want the space. (See, *e.g., Dickey v. Hurd* (1st Cir. 1929), 33 F.2d 415, 419, *cert. denied* (1929), 280 U.S. 601, 74 L. Ed. 646, 50 S. Ct. 82 (acceptance subject to, *inter alia*, a survey with which to verify and identify acreage and boundaries of subject land tract held invalid).) In the latter instance, the lessor would be in no position to claim that CNB accepted the offer unconditionally because CNB explicitly based its acceptance upon its approval of what it found either on "inspection" or "identification." See *Englestein v. Mintz* (1931), 345 Ill. 48, 63.

If the offer was unclear to CNB, or the language of the offer insufficiently identified the space, CNB could have inquired of its lessor within the 30 days of the option period, or could have demanded further identification as part of its contract rights under the lease within that time. CNB points to no instance in which CNB did anything with regard to "inspecting" or "identifying" the option space beyond the visit of two of its officers to the floors on which the space was available, during which time they inquired of persons other than the lessor or its agents with respect to where the space might be. Nor did CNB advise defendants that the offer of option space was so unclear or deficient as to be in violation of the contract terms. Under these circumstances, its effort to clarify the offer by qualifying its acceptance upon its "inspection" or "identification" must be deemed conditional and thereby ineffective.

CNB attaches considerable significance to its March 6, 1980, letter to Fleetwood, in which CNB unequivocally confirmed the exercise of its option. This letter, however, was sent after the expiration date of CNB's option. CNB's argument that the activities of the defendants subsequent to the date it purportedly exercised its option were clear evidence that defendants acknowledged the validity of CNB's exercised option must also be rejected. Indeed, by executing an amendment to EBC's lease and leasing the option spaces to EBC on March 20, 1980, defendants appear to have demonstrated that they

considered CNB's purported exercise of an option to be ineffectual.

## II

■ Defendants' first affirmative defense, and paragraphs 9 and 10 of their counterclaim, alleged that CNB's exercise of its option rights for space not to be utilized for bank purposes were *ultra vires* by virtue of limitations imposed upon banks by section 29 of the National Bank Act (Act) (12 U.S.C. sec. 29 (1976)). That affirmative defense and paragraphs 9 and 10 were stricken in a separate order entered by the circuit court on August 12, 1980, from which order defendants appeal. The merits of the affirmative defense relating to the four option spaces need not be decided since CNB's attempt to exercise its option with respect to them was conditional and thus ineffectual, as shown in the preceding discussion. Paragraphs 9 and 10 of defendants' counterclaim portend to encompass CNB's authority to exercise future options, however, and defendants' contentions might be addressed in that context. Nevertheless, the merits of those contentions will not be reached because we agree with the circuit court's conclusion, as a matter of law, that section 29 actions can be initiated only by the Comptroller of the Currency of the United States and could not constitute the basis for a claim for relief.

Paragraphs 9 and 10 of the counterclaim allege that: CNB's authority is specifically limited by section 29 of the Act to acquiring real estate necessary for CNB's business as a bank; CNB has sublet to others more than one-half the space leased under its original lease; and such subletting is unrelated to its business as a national bank, thereby violating section 29. The pertinent part of section 29 provides: "A national banking association may purchase, hold and convey real estate for the following purposes, and for no others: First. Such as shall be necessary for its accommodation in the transaction of business *** ."

■ ■ The fact that a Federal statute is alleged to have been violated resulting in harm to someone does not necessarily give rise to a private cause of action in that person's favor. (*Cannon v. University of Chicago* (1979), 441 U.S. 677, 688, 60 L. Ed. 2d 560, 570, 99 S. Ct. 1946, 1953.) In ascertaining whether a private remedy is implicit in a statute not expressly providing one, four factors are relevant. (*Cort v. Ash* (1975), 422 U.S. 66, 78, 45 L. Ed. 2d 26, 36, 95 S. Ct. 2080, 2087;[2] *California v. Sierra Club* (1981), 451 U.S. 287, 293, 68 L. Ed.

---

[2]The four criteria in *Cort v. Ash* are: "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' [citation]—that is, does the statute

2d 101, 107, 101 S. Ct. 1775, 1778-79.) The threshold question is whether the statute was enacted for the benefit of a special class of which plaintiff is a member. *Cannon v. University of Chicago* (1979), 441 U.S. 677, 689, 60 L. Ed. 2d 560, 571, 99 S. Ct. 1946, 1953.

The limitation on the power of national banks to invest in real estate contained in section 29 was designed to protect bank depositors and stockholders from risky investments. (*Colorado National Bank v. Bedford* (1940), 310 U.S. 41, 49, 84 L. Ed. 1067, 1072, 60 S. Ct. 800, 804; *Exchange Bank of Commerce v. Meadors* (1947), 199 Okla. 10, 13, 184 P.2d 458, 463.) Defendants do not purport to base standing upon their identity as members of either of these classes, therefore no private section 29 action may be implied here. (See *Golar v. Daniels & Bell, Inc.* (S.D.N.Y. 1982), 533 F. Supp. 1021, 1026; *Stein v. Galitz* (N.D. Ill. 1978), 478 F. Supp. 517, 520-21; but see *American Society of Travel Agents, Inc. v. Bank of America National Trust & Savings Association* (N.D. Cal. 1974), 385 F. Supp. 1084, which construes section 24 (seventh) of the Act.) Furthermore, it has long been recognized that the primary enforcement of the National Bank Act is left to the Comptroller of Currency, not to private parties. See, *e.g.*, *Kerfoot v. Farmers' & Merchants' Bank* (1910), 218 U.S. 281, 54 L. Ed. 1042, 31 S. Ct. 14; *Stein v. Galitz* (N.D. Ill. 1978), 478 F. Supp. 517, 520.

Paragraph 11 of the counterclaim alleges that defendants compete directly with CNB for the leasing and subleasing of space at the Building. Defendants as counterplaintiffs sought a declaratory judgment finding that CNB cannot exercise its options for space not used in its banking business. EBC claims that it has standing as a director competitor of CNB to seek declaratory relief against CNB for its real estate activities purportedly violating section 29 of the Act. None of the cases relied upon by EBC hold that a private party competitor has standing to directly challenge a national bank's real estate transactions assertedly prohibited by section 29 of the Act. In *Investment Company Institute v. Camp* (1971), 401 U.S. 617, 28 L. Ed. 2d 367, 91 S. Ct. 1091, *Arnold Tours, Inc. v. Camp* (1970), 400 U.S. 45, 27 L. Ed. 2d 179, 91 S. Ct. 158, *Association of Data Processing Service Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 25 L. Ed. 2d 184,

create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [Citation.] Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Citations.] And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citations.]'' (Emphasis in original.)

90 S. Ct. 827, and *Baker, Watts & Co. v. Saxon* (D.D.C. 1966), 261 F. Supp. 247, 248, the courts granted standing to private competitors to seek judicial review of a ruling or regulation issued by the Comptroller of Currency. No such administrative action is involved in the instant controversy. In *Saxon v. Georgia Association of Independent Insurance Agents, Inc.* (5th Cir. 1968), 399 F.2d 1010, 1016-17, the decision to grant standing to a group of insurance agents was based on the legislative history of the Act which reflected a congressional intent to protect insurance agents from an invasion of their insurance agency business by national banks in certain cities. No analogous legislative intent with respect to EBC emerges here.

Defendants meet no other criteria set forth in *Cort v. Ash*. We conclude that EBC lacks standing to obtain the relief sought in its counterclaim and decline to comment on the merits thereof.

## III

A. Implicit in the circuit court's written judgment of March 5, 1981, which it orally expressed earlier, was a denial of the relief sought in count II of CNB's complaint, namely, a judgment declaring EBC's option rights subordinate to CNB's option rights as to all space becoming available in the Building. CNB urges error, arguing that the evidence clearly established: the unity of ownership and interest among the Partnership, Fleetwood and EBC; the importance of the original CNB lease in the development of the Building; and that the option rights of EBC were granted only after defendants had been unable to persuade CNB to give up the benefits of its option and was solely designed to limit or avoid CNB's valuable option rights. CNB concludes that the "belated" attempt to grant a superior option right to EBC constituted bad faith dealing in violation of the CNB lease.

Contracting parties impliedly promise to act in good faith. (*Osten v. Shah* (1982), 104 Ill. App. 3d 784, 786, 433 N.E.2d 294.) An instrument capable of two conflicting constructions, one of which imputes bad faith to one of the parties and the other does not, requires the latter construction to be adopted. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683.) Although the express words may be absent, a court of equity will order performance in accordance with what it believes to be required by good faith and fair dealing. (*Spircoff v. Spircoff* (1979), 74 Ill. App. 3d 119, 128, 392 N.E.2d 363.) Questions of good faith are generally issues of fact, reserved to the sound discretion of the trier of fact. *Honkomp v. Dixon* (1981), 97 Ill. App. 3d 476, 480, 422 N.E.2d 949.

The circuit court here made no express findings on the issue of

defendants' bad faith. Were it not for CNB's conditional exercise of the options for the four spaces, its argument with respect thereto might have been persuasive under these facts. Not having exercised its option according to its terms leaves no basis for altering the circuit court's decision in this regard. As to future option opportunities, paragraph 3(d) of CNB's lease does not suggest that no other tenant would be granted similar option rights. To the contrary, the option is made specifically subordinate to the rights of other tenants holding a major leasehold interest more proximate to option space than CNB's major leasehold interest. The record demonstrates further that EBC was formed in 1975, several years prior to the time the instant controversy arose. It engages in the business of leasing spaces not only in the Building, but in another at 200 West Jackson Blvd. It subleases space in the Building to individuals and businesses, and provides to them secretarial services and conference facilities. According to EBC's operations overseer, the purpose of the lease renewal agreement granting EBC its option rights was to enable EBC to acquire additional space on a "competitive basis" with all tenants in the Building, not just CNB. Rubenstein stated that the purpose of granting EBC's option rights was to limit CNB's rights and to implement the original purpose of EBC, which was to create a profitable real estate business. The circuit court could have found that Teinowitz, Feinberg, Rubenstein and the Partnership had a valid business reason for granting the option to EBC: they would receive greater rent under a lease of option space to EBC than they would receive under a lease of space to CNB. The circuit court also could have found that CNB contractually assumed the risk that its option rights would be limited under terms consistent with paragraph 3(d) of their lease for valid business reasons. Under these circumstances, no abuse of discretion emerges in the circuit court's determination of this issue.

B. CNB contends that defendants' grant of option rights to EBC, insofar as it vitiates CNB's rights, should be disregarded because EBC was not a separate entity. CNB emphasizes the fact that Teinowitz, Rubenstein, and Feinberg were the general partners of the Partnership, the only partners of Fleetwood and the sole stockholders of EBC. CNB maintains that even the Partnership disregarded EBC's lack of substance in the EBC lease when it instructed CT&T to lease to a third party space in the Building already allegedly covered by a lease to EBC under its new option right.

 Generally, a corporation is deemed separate and distinct as a legal entity from its shareholders and officers. (*Superior Coal Co. v. Department of Finance* (1941), 377 Ill. 282, 289, 36 N.E.2d

354.) The corporate entity will be disregarded when the corporation is merely the alter ego or the business conduit of a dominating personality, or the corporate entity presents an obstacle to the protection of private rights, or when, under the circumstances, an adherence to the fiction of separate existence of the corporation would sanction a fraud or promote injustice. (*People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29, 277 N.E.2d 844; *Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004, 415 N.E.2d 560.) Stock ownership by itself in one corporation by another entity, however, in and of itself does not create an identity of interest between the two or the relation of alter ego (see *Main Bank v. Baker* (1981), 86 Ill. 2d 188, 204, 427 N.E.2d 94), even where the corporation is closely held (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 1004). The circuit court's oral finding that EBC was a valid and viable corporation was sufficiently supported by the record for the reasons stated in part IIIA of this opinion. It cannot be concluded as a matter of law that the distinctiveness of Fleetwood, Partnership and EBC ceased to exist under the circumstances of this case.

CNB recognizes that paragraph 3(d) implicitly allows defendants to grant option rights which may conflict with CNB's but asserts that such rights must be granted in the tenant's·original lease or in a subsequent lease on space upon which CNB did not exercise its option and may not be created by amendment to the existing lease. It urges that because the original EBC lease did not contain any option rights to lease additional space in the Building, CNB's option rights vested and were superior to any newly granted option rights to EBC. CNB's "vested rights" argument has no support in the language of paragraph 3(d), however, nor in any other provision in the CNB lease and, accordingly, must be rejected.

C. CNB objects to that part of the order specifying that other tenants' option rights are superior to CNB's under paragraph 3(d) with respect to proximity of that tenant's major leasehold interest to new option space becoming available in the future, maintaining that the circuit court should not have adjudicated the rights of nonparty tenants. Defendants respond that since CNB failed to object to the non-joinder of parties until the final hearing, the circuit court committed no error in not joining those tenants, citing *Crescio v. Crescio* (1937), 365 Ill. 393, 6 N.E.2d 628; *Chicago, Burlington & Quincy R.R. Co. v. Illinois Commerce Com.* (1936), 364 Ill. 213, 4 N.E.2d 96; *Theodorou v. Community Builders, Inc.* (1972), 6 Ill. App. 3d 277, 285 N.E.2d 474. Defendants argue that the absent tenants were benefited by the order if they were affected at all. Defendants'

response, however, misses the thrust of CNB's argument. CNB does not contend that absent tenants should have been joined at the trial court level or that they were necessary parties; rather, it maintains that these tenants and their rights in relation to CNB's rights were never before the circuit court and that there was nothing for it to adjudicate. We agree. The cases relied upon by defendants are inapposite to the present issue. In those cases, the appellants were attacking the judgments rendered because necessary parties were not joined.

■■ Defendants also argue that the "non-joinder" of other tenants was not reversible error because their interests were adequately represented by EBC and the lessors. They cite *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 362 N.E.2d 382, for the proposition that the rule requiring joinder of indispensable parties is not applied when an absent party is so represented by another that his interest receives actual and efficient representation. This doctrine of representation applies where persons are before the court who have the same interests, and will be equally certain to bring them forward and protect them, as those of the omitted persons. (*Mortimore v. Bashore* (1925), 317 Ill. 535, 540, 148 N.E. 317.) We are not persuaded that such is the case here in light of the self-avowed competitive nature of EBC's business. Further, when CNB attempted to offer into evidence the lease of one nonparty tenant, defendants objected on the ground that the nonparty lease was irrelevant and defendants' objection was sustained.

■■ A court is without jurisdiction to enter a decree or order which directly affects a right or interest of a person not before it. (*Lain v. John Hancock Mutual Life Insurance Co.* (1979), 79 Ill. App. 3d 264, 269, 398 N.E.2d 278; *Lerner v. Zipperman* (1979), 69 Ill. App. 3d 620, 624, 387 N.E.2d 946.) The only rights before the circuit court were CNB's *vis-a-vis* defendants'; the court was without authority to adjudicate the substantial rights of absent tenants.

## IV

Paragraph 3 of the judgment, in part, orders defendants, except EBC, to prepare and cause to be executed leases for the subject four option spaces with CNB in a "form substantially similar to the CNB Lease." CNB argues that this part of the judgment should be modified so as to require the inclusion of paragraph 3(d) of its lease in the leases of the four option spaces at issue as well as in leases of option spaces as they become available in the future. The notice of appeal and the order from which the appeal was taken by CNB referred to the four subject option spaces involved in the instant controversy. As to those spaces, the disposition of CNB's acceptance as conditional

and invalid makes this issue moot.

With respect to any controversy which may arise affecting option spaces becoming available in the future, neither the order entered by the circuit court nor the orders proposed by CNB nor its notice of appeal purport to address this issue and we decline to do so for that reason. Nevertheless, since the parties in their respective briefs appear to view the language of paragraph 3(d) from entirely different perspectives, no doubt the issue will again arise and may become subject to future litigation. Because of that likelihood, we make the observation that the language contained in paragraph 3(d) of CNB's lease with respect to the proposed inclusion or suggested exclusion of new option language in each new lease which may emerge is far from clear. The construction of leases is subject to the same rules and standards of interpretation applicable to contracts. (*Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 575, 414 N.E.2d 1152.) The primary object of the construction of a contract or lease is to give effect to the intentions of the parties. (*Blackhawk Hotel Associates v. Kaufman* (1981), 85 Ill. 2d 59, 64, 421 N.E.2d 166.) In some circumstances, such as appears in the present language, parol evidence may be considered in ascertaining those intentions. (*Main Bank v. Baker* (1981), 86 Ill. 2d 188, 199, 427 N.E.2d 94.) The language used in paragraph 3(d) is patently susceptible to more than one meaning, and its interpretation should be subject to further hearing with such extrinsic evidence as may be necessary in arriving at the intent of the parties.

For the foregoing reasons, paragraphs 1, 3 and 4 of the March 5, 1981, judgment, finding CNB's exercise of its option with respect to the four option spaces there involved to have been valid and concommitant injunctive relief granted pursuant thereto is reversed. Paragraph 2 of that judgment, finding EBC's lease of the option spaces void and of no effect, is reversed. Paragraph 6 of that order, insofar as it purports to adjudicate the rights of nonparty tenants, is reversed. The balance of the circuit court order of March 5, 1981, is otherwise affirmed, except that each party shall bear its own costs. The order of August 12, 1980, striking paragraphs 9 and 10 of defendants' counterclaim is also affirmed.

Affirmed in part, reversed in part.

STAMOS, P.J., and DOWNING, J., concur.