853 F.2d 1392
 UNITED STATES of America, Plaintiff-Appellee,
v.
BOB STOFER OLDSMOBILE-CADILLAC, INC. and Robert H. Stofer
and Marcia L. Stofer, Defendants/Cross-Plaintiffs Appellants,
v.
Bernard O. NELSON and Jack W. Graham,
Defendants/Cross-Defendants Appellees.
 No. 87-3019.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1988.
Decided July 29, 1988.
 
 Guy E. McGaughey Jr., McGaughey & McGaughey, Ltd., Lawrenceville, Ill., for defendants/cross-plaintiffs appellants.
 Richard P. Glovka, Wildman Harrold Allen & Dixon, Chicago, Ill., for plaintiff-appellee.
 Before POSNER, COFFEY, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 The cross-plaintiffs, Bob Stofer Oldsmobile-Cadillac, Inc., and Robert and Marcia Stofer, appeal from the district court's order denying their request for specific performance of a provision of a sales contract requiring cross-defendants, Jack Graham and Bernard Nelson, to indemnify the Stofers against any liability arising from debts owed to, among others, the Small Business Administration, the original plaintiff in this case.
 
 
 2
 We conclude that because the contract between the parties was the result of a mutual mistake of fact, and because the Stofers attempted to obtain a benefit from the contract to which they were not entitled, the district court's decision must be affirmed.
 
 I. BACKGROUND
 
 3
 Robert and Marcia Stofer were the sole owners of Bob Stofer Oldsmobile-Cadillac, Inc. (hereinafter the "dealership"), a General Motors ("GM") franchise located in Effingham, Illinois. In 1980, as part of their effort to capitalize the business, the Stofers obtained a $667,000.00 loan from the Small Business Association ("SBA"). This loan was secured by a mortgage on the dealership property, the Stofers' residence and a security agreement covering inventory and other collateral. The Stofers also signed a personal guaranty. The real estate on which the dealership was situated, was owned by the Stofers individually. To meet their SBA payments, the Stofers entered into an arrangement with their dealership whereby the dealership rented the property from them. The Stofers then used the rental payments to make monthly payments to the SBA. In addition to their obligation to the SBA, the Stofers also owed the First National Bank of Effingham (hereinafter "the bank") a substantial sum, collateralized by proceeds generated by the sales of the dealership's inventory.
 
 
 4
 In 1982, the bank became aware that the Stofers were selling cars "out of trust"--that is, the proceeds generated by the car sales were not being paid to the bank in accordance with the loan agreement. When the bank threatened to conduct an inventory check, Mr. Stofer confessed that he had sold approximately $200,000.00 worth of cars out of trust but maintained that he had done so to keep the dealership afloat.
 
 
 5
 The bank, whether out of largess and in the interest of maintaining the dealership or, as the Stofers suggest, for other, more sinister reasons, offered to assist Mr. Stofer in keeping the business viable. In return, the bank required Mr. Stofer to place his business and residential real estate in a land trust--presumably to prevent dissipation of those assets. In addition, Mr. Stofer was required to relinquish his decision-making authority to cross-defendant Bernard Nelson, a bank officer, and a former car dealer. After a short time, the bank proposed an outright sale of the Stofers' rapidly deteriorating franchise to Mr. Nelson and a financial backer, cross-defendant Sam Sgro. A series of negotiations, orchestrated by the bank, ensued and eventually a sales agreement was reached.
 
 
 6
 On July 8, 1982, the Stofers entered into a contract with Sgro and Nelson under which the Stofers were to receive $20,000.00 in return for their interest in three parcels of real estate described in the agreement and all their shares in the GM dealership. In return, Nelson and Sgro agreed to indemnify the Stofers against any liabilities owed to, among others, the SBA. Thus, Nelson and Sgro became responsible for the monthly payments to the SBA on the $667,000.00 note.
 
 
 7
 For reasons not entirely known, cross-defendant Sam Sgro became disenchanted with the sales agreement shortly after it was executed. The bank, envisioning a collapse of the entire deal, found a new investor--cross-defendant Jack Graham. Graham agreed to invest in the business and both Nelson and Sgro assigned their rights and duties under the sales contract to Graham. Thus, Graham became the sole owner of the dealership. Nelson however, continued to run the dealership for Graham.
 
 
 8
 At the time Nelson and Sgro entered into the contract with the Stofers, Mr. Stofer purportedly had agreed to assist Nelson and Sgro in obtaining a transfer of the GM franchise. Despite the fact that Nelson and Sgro had purchased both the corporate and individual dealership assets and liabilities from Stofer, Stofer was not authorized to transfer the actual GM franchise. Nelson and Sgro therefore, agreed to apply to GM for the franchise after the sales agreement had already been signed with the understanding that Stofer would help them obtain it.
 
 
 9
 However, when Sgro withdrew from the agreement and Graham stepped in to take his place, Mr. Stofer's attitude underwent a dramatic change. Rather than assisting Nelson and Graham in their efforts to obtain the GM franchise, Stofer did everything he could to hinder it. This abrupt about-face appears to have been the result of two developments--first, Graham's participation in the deal and second, the discovery of a crucial error in the dealership sales contract.
 
 
 10
 Under the contract, three parcels of real estate had been conveyed to Nelson, Sgro, and ultimately, Graham. However, none of these properties included the one on which the dealership facilities were located. Once the problem was discovered, Nelson and Graham quickly pointed out that all parties had intended for the business property to be transferred. They maintained that they would never have assumed a debt (the SBA loan) without also acquiring the underlying assets. Mr. Stofer, on the other hand, took the position that the business property purposefully had been omitted from the contract and that, in fact, Nelson and Graham owed him rent.
 
 
 11
 Stofer, realizing that the contract contained a mistake in his favor, then notified GM that the sale of his dealership was the result of coercion and that he had begun a suit for ejection against Graham and Nelson in state court. In addition, Stofer's attorney began a letter-writing campaign threatening to bring various parties, including GM, into the ejection suit if Graham and Nelson were awarded the franchise.
 
 
 12
 Graham and Nelson, in turn, filed a lawsuit in state court for reformation and specific performance arguing that although the sales contract did not specifically so state, the intention of the parties, at the time of the contract's execution, was that the Stofers would assist Graham and Nelson in obtaining the franchise. By engaging in activities designed to thwart Nelson and Graham, they claimed the Stofers breached the contract. Graham and Nelson therefore requested that the court reform the contract to reflect the parties' agreement and to enforce the contract against the Stofers.
 
 
 13
 During this dispute between the parties, no payments were being made to the SBA. Eventually, the SBA filed this lawsuit in federal court seeking to foreclose on the Stofers' real estate and to obtain a personal judgment against the Stofers for any remaining debt. The Stofers cross-claimed against Graham and Nelson, seeking specific performance of the indemnification clause. In defense to the Stofers' claim for specific performance, Graham and Nelson pled mutual mistake of fact and unclean hands. Specifically, Graham and Nelson claimed that they owed no duty to indemnify the Stofers for SBA loan payments on the dealership property because, due to a mutual mistake of fact, the property had never been transferred to them. In addition, they claimed that, because the Stofers had attempted to capitalize on the parties' mistake both by seeking rent and by interfering with Graham's and Nelson's attempt to obtain the GM franchise, the Stofers came to equity with unclean hands.
 
 
 14
 The SBA's foreclosure suit was bifurcated from the Stofers' cross-claim. Ultimately, the SBA obtained a judgment against the Stofers and foreclosed on the real estate. The Stofers' real estate, including the dealership facilities, were eventually sold to outside parties. However, because the value of the foreclosed property was insufficient to cover the debt owed the SBA, judgment was also entered against the Stofers personally.
 
 
 15
 Following the foreclosure action, the cross-claims were tried in district court. At the finish of a five-day bench trial, the court concluded that the failure to transfer the real estate on which the dealership facilities were situated was the result of a mutual mistake of fact. The court ruled that the Stofers' testimony, that they never intended to transfer the commercial property, was simply not credible and that it was highly unlikely that Graham and Nelson would assume the liabilities on a property without also receiving that property. The court next ruled that it could not rescind the contract on the basis of the mutual mistake because the parties could not be returned to status quo. On the other hand, given the Stofers' attempt to take advantage of the situation by interfering with Nelson's and Graham's efforts to become the GM franchise, the court was not inclined to grant their request for specific performance. The court therefore denied the Stofers' cross-claim for specific performance, leaving them personally liable for the sums still owed the SBA.
 
 II. THE APPEAL
 
 16
 The Stofers filed this appeal arguing that the district court's finding of a mutual mistake of fact was not supported by the evidence. In fact, the Stofers took the position that they never intended to transfer title to the commercial real estate to Graham and Nelson and that if Nelson and Graham were under the impression they were getting the property, they were operating under a unilateral mistake of fact. Moreover, because the Stofers were only getting paid $20,000.00 under the sales contract, they argue it was not implausible for them to retain the commercial real estate to allow them to collect supplemental rental income. The Stofers also claim that because the parties cannot be returned to the status quo, Graham and Nelson are not entitled to recision of the contract. Finally, the Stofers state that there was no evidence they came to equity with unclean hands. That is, the Stofers argue there was nothing in the sales contract which required them to assist Graham and Nelson in obtaining the GM franchise. Even if they were required to lend their assistance, they claim that their failure to do so was not directly related to the alleged mutual mistake of fact. Thus, the defense of unclean hands is not directly related to their request for specific performance and cannot be used to nullify that request.
 
 III. DISCUSSION
 
 17
 On appeal, we are, of course, obligated to accept the district court's findings of fact as true unless those findings are clearly erroneous. Fed.R.Civ.P. 52(a); Andre v. Bendix Corp., 841 F.2d 172 (7th Cir.1988); Torres v. Wis. Dept. of Health & Social Services, 838 F.2d 944 (7th Cir.1988). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse...." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985). Where the district court's findings are based on the court's determinations of witness credibility, they are accorded an even greater degree of deference, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bears so heavily on the listener's understanding of and belief in what is said." Id., 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 18
 The district court found, and our own review of the record confirms, that when the Stofers first began experiencing financial difficulties and agreed to put their parcels of real estate into a land trust, all parties assumed that both the Stofers' commercial and residential properties would be put into that trust. The bank employee, who was responsible for obtaining a description of the real estate to be put in the trust, relied on a real estate description contained in the SBA mortgage documents. That description should have been the same as the description of the real estate which was to be placed in trust. In copying the description of the real estate, the bank employee referred to an attachment to the SBA mortgage. That attachment actually contained a description of a small strip of real estate excepted from those parcels included in the SBA mortgage. Thus, the description of Stofers' commercial property was omitted from the real estate described in the land trust. This mistake was compounded when the erroneous deed of trust became the basis of the sales contract between the Stofers and Nelson and Sgro. Thus, when the sales agreement was prepared, the description of the commercial real estate was again omitted.
 
 
 19
 Despite the mistake contained in the land sale contract, the district court found that the parties had intended to transfer the commercial property in the sales contract as evidenced by notes of a discussion between Mr. Stofer and Mr. Sgro concerning the business. Those notes, which consist, in main, of a list of Mr. Stofer's business assets and liabilities, show the commercial real estate as both the biggest asset, worth approximately $800,000.00, and encumbered by the biggest liability, the $600,000.00 SBA loan. Not only do the notes reflect an intent to trade the asset for the assumption of the liability, but, as the district court found, Mr. Stofer testified that when the deal was first discussed, the parties agreed that the business property was to be transferred.
 
 
 20
 Q. And the buy out that was being discussed between you and Sgro concerned their getting not only the stock and the corporate assets but also the 2.6 acres, didn't it?
 
 
 21
 A. Those were all off as of July 2 so there was no more, no deal.
 
 
 22
 ....
 
 
 23
 Q. Whether they were off as of July 2nd, before July 2nd, they certainly contemplated getting the 2.6?
 
 
 24
 A. I don't know what they contemplated.
 
 
 25
 Q. Well didn't your discussion contemplate giving them personal assets as well as business assets and their assuming personal liabilities as well as business liabilities as reflected on Nelson Exhibit 17A?
 
 
 26
 A. It also reflects a lot of other things in the lower right-hand corner, Mr. Giovka. (Trial Transcript, Testimony of Mr. Stofer, pp. 290-291.)
 
 
 27
 Mr. Stofer's indirect admission that the parties had discussed the transfer of the commercial property was confirmed more directly in later testimony.
 
 
 28
 Q. And these discussions that you had with Mr. Sgro, before McGaughey [Mr. Stofer's trial counsel] got involved, contemplated your turning over all personal and corporate assets and your--and their assuming all personal and corporate liabilities, isn't that right?
 
 
 29
 A. That is what they assumed, I guess.
 
 
 30
 Q. That's what you talked about isn't it?
 
 A. Sometimes. (Transcript, pp. 375-376.)
 
 31
 The district court correctly concluded that the parties had discussed the transfer of all assets when negotiations first began. In fact, a draft sales agreement drawn before July 2, 1982, during a time when Mr. Stofer admitted the parties had agreed to transfer the commercial real estate, contained the erroneous legal description again omitting the dealership property. This indicates that the documents did not accurately reflect the parties' intentions.
 
 
 32
 In support of his contention that the parties' intentions changed between the time the draft and final agreement were drawn, Mr. Stofer made much of the fact that negotiations broke down after July 2nd. According to Mr. Stofer, the final agreement signed after July 2, 1982, accurately reflects the parties' intent to omit the commercial real estate from the sales agreement.
 
 
 33
 The district court found that such assertions by the Stofers lacked credibility. At the time the final agreement was reached, Mr. Stofer's own attorney complained that the sales contract, which left the Stofers with only a $20,000.00 payment, was unduly harsh. From this uncontradicted testimony, the court reasonably inferred that, neither the Stofers nor their attorney believed they would retain title to the commercial real estate, or receive additional proceeds from the sale by way of rental income.
 
 
 34
 Under Illinois law, which must control these pendent jurisdiction claims, a mutual mistake of fact exists "when the contract has been written in terms which violate the understanding of both parties." Ballard v. Granby, 90 Ill.App.3d 13, 16, 45 Ill.Dec. 485, 487, 412 N.E.2d 1067, 1069 (3d Dist.1983), quoting Biren v. Kluver, 35 Ill.App.3d 692, 696, 342 N.E.2d 325 (2d Dist.1976). Graham and Nelson, who requested recision of the contract,[1] had the burden of proving, by clear and convincing evidence, that "there had been a meeting of the minds resulting in an actual agreement between the parties, but at the time the agreement was reduced to writing and executed some agreed-upon provision was omitted ... either through a mutual mistake or through a mistake of one party and fraud by another." Great American Fed. Savings & Loan Assoc. v. Grivas, 137 Ill.App.3d 267, 91 Ill.Dec. 870, 875, 484 N.E.2d 429, 434 (1st Dist.1985).
 
 
 35
 Based on all the evidence adduced at trial, only some of which is described above, we believe that the district court correctly found that Graham and Nelson proved the existence of a mutual mistake of fact. Normally, "a case of mutual mistake of fact as to a material matter affecting the substance of a transaction affords grounds for an application by either party for a recision." Barker v. Fitzgerald, 204 Ill. 325, 68 N.E. 430 (Ill.1903). However, as the district court found, despite the parties' mutual mistake of fact in this case, neither party can be returned to their respective positions at the time the contract was executed. Thus, recision is not an appropriate remedy. Diedrich v. Northern Ill. Pub. Co., 39 Ill.App.3d 851, 350 N.E.2d 857, 864 (2d Dist.1976).
 
 
 36
 The issue then is whether the Stofers' request for specific performance must be granted. The district court said no, finding that the Stofers attempted to affirmatively thwart Nelson's and Graham's effort to obtain the GM franchise, and thus, came to seek equity with unclean hands.
 
 
 37
 Although we agree with the district court that the Stofers' unclean hands bar their request for specific performance, we think there is a more compelling reason for this conclusion than the fact that the Stofers may have interfered with Nelson's and Graham's attempt to obtain the GM franchise. The Stofers attempted to take advantage of what they must have known was a mutual mistake in the contract. Realizing that they still held title to the commercial real estate, the Stofers charged Graham rent for its use rather than pointing out the error in the legal description. The Stofers' attempt to collect rent was nothing less than disingenuous in light of the fact that Graham was to pay the mortgage on the real estate. In fact, in a move, which can only be characterized as brazen, the Stofers threatened to file an action for eviction. Then to further strengthen their hand, the Stofers threatened to draw both GM and a U.S. Senator into the eviction lawsuit. Obviously, the Stofers' acts interfered with cross-defendants' efforts to achieve a transfer in the ownership of the dealership.
 
 
 38
 For reasons which were primarily based on personal animosity, Mr. Stofer determined that he simply did not want Mr. Graham to have his old business. Thus, in an abrupt turn-about, Mr. Stofer went from the position that though unpleasant, the sale of his business was necessary--to the position that the sale was the result of duress and coercion.[2]
 
 
 39
 "He who comes into equity must come with clean hands" is one of the commandments of equity. As defined by this court in a recent case, this means "that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what, if any, remedy the plaintiff is entitled to." Shondel v. McDermott, 775 F.2d 859, 868 (7th Cir.1985). Under Illinois law, "one seeking specific performance [under a contract] must have fulfilled all his obligations under the contract." Hale v. Ault, 83 Ill.App.3d 78, 38 Ill.Dec. 404, 408, 403 N.E.2d 635, 639 (3d Dist.1980). A party to a contract, seeking specific performance, must show, if it has not already done so, that it is and was prepared to perform its obligation. If however, the party's course of conduct shows that it has abandoned the contract, it is not entitled to seek specific performance. Arnold v. Leahy Home Bldg. Co., 95 Ill.App.3d 501, 51 Ill.Dec. 285, 420 N.E.2d 699 (2d Dist.1981). Simply put, the party seeking specific performance must have made a "conscientious effort to comply honestly with the contract." Laegelar v. Bartlett, 10 Ill.2d 478, 140 N.E.2d 702 (Ill.1957): see also Pescaglia v. Gianessi, 9 Ill.App.3d 582, 295 N.E.2d 148 (3d Dist.1973). Complying honestly with one's obligations under a contract entails acting "fairly and without fraud or deceit as to the controversy in issue." Precision Instrument Mfg. Co., et al. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).
 
 
 40
 The Stofers did not act honestly--they did not stand ready to fulfill all their obligations under the contract. As we have already said, the parties originally intended for all the Stofers' real estate, including the real estate on which the dealership stood, to be made a part of the land sale contract. Thus, the Stofers were obligated to act in a manner consistent with this intention. That is, if upon discovery of the parties' mutual mistake, the Stofers had agreed to a reformation of the contract to reflect everyone's intent, only then would they be entitled to be indemnified for obligations on the real estate. Under Illinois law, even where express words are missing from a contract, a court of equity will order performance in accordance with what is required by good faith and fair dealing. Central Nat'l Bank in Chicago v. Fleetwood Realty Corp., 110 Ill.App.3d 169, 65 Ill.Dec. 730, 441 N.E.2d 1244 (1st Dist.1982). Rather than acknowledging the mistake, however, the Stofers attempted to take advantage of it by charging rent, threatening to file an eviction suit, and bringing GM into the matter. Thus, regardless of their obligation to aid the cross-defendants in obtaining the GM franchise (or at least remain neutral), the Stofers' actions left them with unclean hands. Their behavior marked an intention to abandon the agreement, as it had originally been discussed and thus, the Stofers are not entitled to specific performance.
 
 
 41
 Based on the reasoning set forth above, the district court's order, denying the Stofers' request for specific performance is AFFIRMED.
 
 
 
 [1]
 Since the commercial real estate had been sold to a third party, pursuant to the SBA's mortgage foreclosure sale, Graham and Nelson were obviously not interested in obtaining reformation of the contract to conform the contract to the parties' intentions
 
 
 [2]
 There can be no doubt that the bank strongly urged Mr. Stofer to place his residential and commercial real estate into trust once it became apparent he was selling cars without applying the proceeds to his loan. Moreover, we appreciate the fact that--in the district judge's words--the bank, which had been less than rigid in enforcing the floor-plan procedures, suddenly "found religion" and decided to play it by the book. On the other hand, the bank and later, Sgro, Nelson, and Graham were willing to bail Mr. Stofer out of a bad situation and it can hardly be said that their actions were coercive