THE DEPARTMENT OF CENTRAL MANAGEMENT SERVICES *et al.*,
Petitioners, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*,
Respondents.

Fourth District   No. 4—90—0627

Opinion filed July 16, 1991.

Roland W. Burris, Attorney General, of Springfield (Lydia S. Mills and Nancy S. Short, Special Assistant Attorneys General, of counsel), for petitioners.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois State Labor Relations Board.

JUSTICE GREEN delivered the opinion of the court:

On October 12, 1989, complainant Illinois Nurses Association (INA) filed an unfair labor practice charge with the Illinois State Labor Relations Board (Board) against respondents Illinois Department of Central Management Services (CMS) and Illinois Department of Corrections (DOC). On November 22, 1989, the Board issued a complaint against respondents which alleged, in most significant part, that CMS and DOC failed to bargain in good faith in violation of section 10(a)(4) of the Illinois Public Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 1610(a)(4)), by refusing to execute a "supplemental agreement" pertaining to a grievance concerning subcontracting of nursing services by DOC at its facilities. On August 14, 1990, after an evidentiary hearing and receiving recommendations of a hearing officer, the Board entered a decision and order finding respondents guilty of unfair labor practices in violation of section 10(a)(4) of the Act and, derived from that offense, section 10(a)(1) of the Act (Ill. Rev. Stat. 1989, ch. 48, par.

1610(a)(1)). *Illinois Department of Central Management Services, Department of Corrections*, 6 Pub. Employee Rep. (Ill.) par. 2038, No. S—CA—90—48 (Illinois State Labor Relations Board, Aug. 14, 1990).

Respondents took judicial review to this court (Ill. Rev. Stat. 1989, ch. 48, par. 1611(e)). They maintain that under contract law and labor law, no binding agreement to settle the grievance was ever reached. They contend that any finding to the contrary was against the manifest weight of the evidence and clearly wrong. We agree with CMS and DOC and reverse.

■■ ■ Section 10(a)(4) of the Act provides that the following is an unfair labor practice:

> "[T]o refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit, including, but not limited to, the discussing of grievances with the exclusive representative." (Ill. Rev. Stat. 1989, ch. 48, par. 1610(a)(4).)

Section 7 of the Act defines the duty to bargain, in part, as:

> "[T]he mutual obligation *** to negotiate in good faith with respect to wages, hours, and other conditions of employment, *** *or the negotiation of an agreement, or any question arising thereunder and the execution of a written contract incorporating any agreement reached if requested by either party* ***." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 48, par. 1607.

Section 10(a)(1) of the Act, which the Board also found respondents guilty of violating, provides an unfair labor practice occurs when an employer "interfere[s] with, restrain[s] or coerce[s] public employees in the exercise of the rights guaranteed in [the] Act." (Ill. Rev. Stat. 1989, ch. 48, par. 1610(a)(1).) The Board concluded a failure to bargain in good faith inherently constitutes an interference with employees' rights.

The record of proceedings before the Board shows that since 1984, INA, CMS, and DOC have been parties to a collective-bargaining agreement which contains a four-step grievance procedure under which the last step is final and binding arbitration. Sometime in 1984 INA filed a grievance alleging that DOC violated the subcontracting provision of the collective-bargaining agreement. The grievance proceeded through the various steps and arbitration began. The parties then agreed to a consent award which was issued by the arbitrator.

Subsequently, INA filed a complaint in the circuit court of Cook County in case No. 86—CH—8877, alleging that Michael Lane, Director of DOC, had violated the consent award. The circuit court deemed the consent award too vague for enforcement and remanded to the arbitrator for further proceedings. The court's order stated it "retained jurisdiction over the matter." During arbitration on remand, the arbitrator suggested the parties again attempt a settlement. Then, INA's representative, Sally Stix, and the representative for CMS and DOC, Gene Vernon, negotiated concerning the subcontracting of nursing services by DOC. In the process, a document entitled "Supplemental Agreement" was developed. Whether this document constituted a binding agreement between the parties is the heart of the litigation. INA filed the instant unfair labor practice charge with the Board when DOC concluded no binding agreement had been reached and refused to sign the alleged agreement.

■ The Director of CMS is the Department's executive head, with responsibility for conducting negotiations over salaries, work hours, and other terms and conditions of employment with respect to State employees on behalf of their employer, the Governor of Illinois. (See Ill. Rev. Stat. 1989, ch. 127, par. 63b109(7).) Therefore, the authority to negotiate collective-bargaining agreements is vested by State statute in CMS, Vernon's employer, and not in the directors of the various State agencies. The evidence was undisputed that on previous occasions Vernon had negotiated labor agreements on behalf of CMS which were deemed valid by the parties without higher approval and some of these had been with Stix.

Here, unlike in prior negotiations between Stix and Vernon, *INA demanded that Director Michael Lane of DOC sign any agreement resolving the grievance.* Stix testified the reason for this was that previously Director Lane had failed to follow an agreement agreed upon by negotiations and INA wanted to be sure he was aware of the terms of any agreement resolving this dispute. The "supplemental agreement" was at least tentatively agreed upon at a meeting between Stix and Vernon in Springfield, on March 27, 1989. Two other people from each side attended the meeting. Correspondence between Stix and Vernon preceded the meeting. The format of the "supplemental agreement" provided for the signature of Lane as the only person signing on behalf of the public employer. No signature line was provided for anyone signing on behalf of CMS.

CMS and DOC maintain the evidence presented to the hearing officer for the Board conclusively showed the parties understood the "supplemental agreement" would become binding only upon Lane's approval. When Vernon was asked, at the evidentiary hearing, whether he informed INA that neither CMS, he nor the other two persons with him had authority to enter into a binding agreement without Lane's approval, Vernon stated, "I believe I did it on several occasions, but I certainly indicated on March 27 that the tentative agreement would have to be submitted to Director Lane for his review and approval." When asked if Vernon had told Stix at the meeting on March 27 that the agreement was subject to review and approval by Lane, Stix responded, "I don't recall him telling me that." She was not asked if he had told her of the need for Lane's approval at any other time and she never testified on that point.

Other evidence and testimony strongly supported Vernon's assertion that the persons negotiating the agreement were aware that any proposed agreement reached on that date was subject to Lane's review, approval, and signature. First, by cover letter of November 9, 1988, with her initial proposed settlement agreement, Stix stated that "[d]ue to the problems INA has had concerning this issue, [INA] insists that (Corrections) Director, (Michael) Lane, sign the final settlement." Second, Stix did testify that at the March 27 meeting she mentioned to those present that she was concerned with whether Lane would "approve" the settlement. Third, Jimmy Butler, a DOC employee who was present at the March 27 meeting, testified Vernon did state at that meeting that the proposed agreement was not final but would be presented to Lane for approval. Fourth, a June 20, 1989, letter by Stix to Vernon expressed concern because of the "failure" of persons from DOC to "approve" the settlement terms worked out at the March 27 meeting. Fifth, Matt Brown, INA business agent, testified he understood the document developed at the March 27 meeting was to be sent to Lane for his "review and signature." However, he also testified he understood that Vernon's approval of the document was binding on DOC and CMS.

Under the statutory provision previously cited, an authorized agent of CMS clearly had authority to bind the State to an agreement settling a grievance with an authorized employees' representative; and, by prior dealings, Vernon clearly had apparent authority to do so unless INA had been advised otherwise. The Board's hearing officer found Vernon's testimony that he informed INA that any March 27 agreement was subject to Lane's approval was accurate. Considering this, and the supporting testimony and evidence we have described,

the hearing officer determined that the parties understood the agreement worked out on March 27 was *tentative* and subject to Lane's approval, citing *Central National Bank v. Fleetwood Realty Corp.* (1982), 110 Ill. App. 3d 169, 441 N.E.2d 1244. Accordingly, the hearing officer recommended the complaint be dismissed.

The Board rejected the hearing officer's recommendation. It accepted the hearing officer's finding that Vernon had told INA negotiators at the March 27 meeting that any settlement agreement was subject to Lane's approval. However, the Board deemed that fact was not very significant. The Board indicated any requirement for Lane's approval was a deviation from past practices and, thus, required that the notice of the requirement be more explicit than any given here. The Board also held any notice of Vernon's lack of authority was given too late to be effective.

In reaching this conclusion, the Board cited, *e.g., Metco Products, Inc. v. NLRB* (4th Cir. 1989), 884 F.2d 156, 132 L.R.R.M. 2777, where the court enforced a National Labor Relations Board (NLRB) order holding an employer guilty of an unfair labor practice and requiring the employer to execute a collective-bargaining agreement (see *Metco Products, Inc.* (1988), 289 N.L.R.B. 76). The evidence before the agency showed that during negotiations with the employees' union, the employer had been represented by an attorney who purported to be head of the employer's bargaining committee and did most of the talking on behalf of the employer. The evidence before the agency was disputed as to whether the lawyer had informed the union that an otherwise binding agreement was subject to approval by the employer's chief executive officer who had attended none of the bargaining sessions. The evidence favorable to the employer indicated that, on occasion, the lawyer negotiating for the employer had told union negotiators he would have to clear certain tentative agreements with the respondent's chief executive officer.

In *Metco*, the NLRB adopted a hearing officer's determination that the employer's negotiator had apparent authority to bind the employer. The *Metco* court noted, with apparent approval, that:

> "The NLRB has long held that 'when an agent is appointed to negotiate a collective-bargaining agreement that agent is deemed to have apparent authority to bind his principal in the *absence of clear notice to the contrary.*' *University of Bridgeport*, 229 NLRB 1074, 95 LRRM 1389, 1390 (1977)." (*Metco*, 884 F.2d at 159, 132 L.R.R.M. at 2778.)

The court stated that the laudable purpose of the foregoing rule is to negate ambiguity as to the authority of a negotiator. However, the

court also stated that the issue of whether a labor negotiator has apparent authority is to be determined according to common law agency principles, citing *NLRB v. Georgetown Dress Corp.* (4th Cir. 1976), 537 F.2d 1239, 1244, 92 L.R.R.M. 3282, 3285.

■ The *Metco* court concluded the question of whether the employer's lawyer had apparent authority to bind the employer was a question of fact (*NLRB v. Donkin's Inn, Inc.* (9th Cir. 1976), 532 F.2d 138, 91 L.R.R.M. 3015), and one upon which the agency determination will not be upset if supported by substantial evidence (*Universal Camera Corp. v. NLRB* (1951), 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456). Here, we must follow the determination of the Board on a factual issue unless that determination is contrary to the manifest weight of the evidence. *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391, 469 N.E.2d 1085, 1088.

The Board also deemed pertinent its decision in *City of Burbank*, 4 Pub. Employee Rep. (Ill.) par. 2048, No. S—CA—88—19, at X—334 n.3 (Illinois State Labor Relations Board, Nov. 7, 1988), wherein it explained:

> "While final approval authority is often reserved to the governing body, in both the private and public sector, the process envisions and encourages approval because the bargaining representative of the governing body is under an obligation to keep that body advised as to the progress of the negotiations and, presumably, gets direction from that body as he or she is at the negotiation table."

We interpret the foregoing to indicate that, in labor negotiations, some inference exists that the negotiators have authority to bind their principal.

■ When questions of construction of statutes, such as the Act, are concerned, courts generally accord deference to the interpretation placed upon the statute by the agency charged with its administration. Nevertheless, that agency's interpretation is not binding and will be rejected when it is erroneous. (*City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 361, 522 N.E.2d 1219, 1222.) Here, the legal question involved actually more nearly concerns the law of agency than that of contracts. In any event, according to *Metco*, the question should be resolved on common law principles subject to a rule, applicable to principles of labor law, requiring clarity in the notice given by a negotiator that he or she lacks authority to bind the principal. The *Metco* court said nothing about any requirement that the notice of lack of authority of a negotiator be given at any particular time in negotia-

tions. No case has been called to our attention which holds that a party is bound to a labor contract or grievance settlement when a sufficiently clear notice of lack of authority of a negotiator is given just prior to formation of the tentative agreement which would constitute a binding agreement if the negotiator had authority to bind his or her principal. No common law rule requires that notice of lack of authority be given by a negotiator at any earlier time.

Here, the undisputed fact that INA required any agreement settling the grievance to be signed by Lane is of great importance in considering the clarity and timeliness, if that is a factor, of notice of lack of Vernon's authority. INA itself had specified a condition which raised a question as to what authority Vernon had. If the understanding between the parties was that whatever Stix and Vernon worked out would be binding, and then they would try to get Lane to sign such an agreement, Stix never testified this was the situation. Such an understanding would be consistent with the testimony of INA business agent Matt Brown, but it is not consistent with the testimony of the other witnesses.

The Board recognizes that, at least at the meeting on March 27, Vernon told Stix something about his lack of authority to enter into a binding grievance settlement agreement, or his unwillingness to do so absent Lane's approval. Even if the prior request for Lane's signature and all of the discussion concerning that request had been based upon an assumption that Stix and Lane would reach a binding settlement agreement and they would then try to get Lane to sign it, Vernon's allegedly new position that his tentative approval was not binding on his principal would seem to be crystal clear. That Stix understood this was borne out by her later letter in which she expressed concern about getting Lane's approval.

■ We hold that the determination of the Board that INA was given insufficient notice that the tentative settlement of the grievance was dependent upon Lane's approval was contrary to the manifest weight of the evidence. Accordingly, we reverse the decision of the Board finding CMS and DOC guilty of unfair labor practices.

Reversed.

STEIGMANN and KNECHT, JJ., concur.