2026 IL App (2d) 240539-U
Nos. 2-24-0539 & 2-24-0678 cons.
Order filed May 29, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

SCOTT TOLLAKSEN, Individually and Derivatively as a shareholder of Lionheart Critical Power Specialists, Inc., and of Lionheart Power Systems, Inc., Plaintiff-Appellant,

v.

WILLIAM STUNKARD, DONALD RITTER, KENNETH LENHART, MICHAEL HUNTER, LIONHEART CRITICAL POWER SPECIALISTS, INC., and LIONHEART POWER SYSTEMS, INC., Defendants-Appellees.

Appeal from the Circuit Court of Kane County.
Honorable Kevin T. Busch, Judge, Presiding.
No. 17-CH-707

LIONHEART CRITICAL POWER SPECIALISTS, INC., and LIONHEART POWER SYSTEMS, INC., Counter-Plaintiffs, Appellees,

v.

SCOTT TOLLAKSEN, Counter-Defendant, Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Kevin T. Busch, Judge, Presiding.
No. 17-CH-707

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held:*    (1) The circuit court erred in granting summary judgment in favor of corporate defendants and the individual shareholder defendants because the undisputed facts established that the corporate defendants failed to exercise their option rights in strict conformity with the pertinent buy-sell agreements within the 30-day contractual period; (2) plaintiff was entitled to summary judgment on corporate defendants' counterclaim for specific performance; (3) the circuit court's finding of contempt and its associated sanctions and award of attorney fees are vacated; and (4) the cause is remanded for reconsideration of plaintiff's motion for leave to file an amended complaint and for further proceedings.

¶ 2    Plaintiff, Scott Tollaksen, appeals from orders of the circuit court of Kane County: (1) denying his motion for summary judgment against Lionheart Critical Power Specialists, Inc. (Critical), Lionheart Power Systems, Inc. (Power) (collectively, "Lionheart" or "Lionheart entities"); (2) granting Lionheart's motion for summary judgment on its counterclaim for specific performance and ordering him to tender his shares for redemption in exchange for net book value; (3) granting summary judgment in favor of the individual shareholder defendants, namely William Stunkard, Donald Ritter, Kenneth Lenhart, and Michael Hunter, on plaintiff's complaint; (4) granting Lionheart's motion for summary judgment on plaintiff's complaint, holding plaintiff in civil contempt, and imposing a sanction of $100 per day, payable to Lionheart, until plaintiff tenders his shares to Lionheart; and (5) denying plaintiff's motion to stay the proceedings.  For the following reasons, we reverse in part, vacate in part, and remand for further proceedings.

¶ 3                                  I. BACKGROUND

¶ 4    The Lionheart entities are closely held Illinois corporations that, during the period relevant to this appeal, were each owned in equal shares by plaintiff and the four individual shareholder defendants, each holding a 20% equity interest and serving as an officer and director.  Plaintiff incorporated Critical in 1999 to complement the business of H. Sam Tollaksen, Co., a company he owned that served as a manufacturers' representative for electric parts and electronic

- 2 -

communications equipment. Critical sells parts and provides repair and maintenance services for critical power systems. Power, incorporated in 2006, provided engineering, furnishing, installation services, and equipment removal services to telecommunications companies. For more than nine years prior to September 2016, plaintiff and the individual shareholder defendants served on the boards of directors and were employed as full-time executive officer employees of both companies.

¶ 5                                    A.  The Buy-Sell Agreements

¶ 6     The shareholders executed written buy-sell agreements for each corporation, Critical on July 25, 2006, and Power on August 1, 2008. The recitals to each agreement identify the individual shareholders and their respective equal ownership interests and confirm that each shareholder is also an employee of the corporation who had devoted his efforts and skill to the corporation. The Critical agreement states that the corporation had issued 1,000 shares, with each of the five shareholders owning 200 shares. The recital relative to the Power buy-sell agreement identifies shareholders—the same five individuals as in the Critical agreement, plus Scott Orsini, who is not a party to the instant matter. Although Power issued 1,000 shares, only 600 shares were outstanding, with each shareholder owning 100 shares.[1] The recitals further state that the success of the corporation depended on the shareholders' personal abilities, interest, support, and attention, and it was therefore "not advisable to permit its stock to go upon the open market for sale." Consistent with that purpose, the shareholders expressed their desire to impose "certain restrictions and obligations upon the shares of the Corporation" and to establish a defined procedure governing the sale or other transfer of shares.

---

[1]Orsini was terminated in 2015, and the remaining shareholders each subsequently acquired 20 of his Power shares.

¶ 7    Apart from the differences in shareholder composition noted above, the recitals and the substantive provisions of the buy-sell agreements are materially identical.  Section one, titled "Restrictions on Transfers," prohibits any shareholder from selling, transferring, pledging, assigning, encumbering, or otherwise alienating any interest in all or any number of shares without the prior written consent of the other shareholders, except as expressly permitted.  It also requires that a restrictive legend be placed on each stock certificate stating that the shares may not be transferred except in accordance with the buy-sell agreement.

¶ 8    Section two, titled "Sales and Purchase of Shares," provides the mechanism by which shares may be sold, transferred, or otherwise disposed of, including notice requirements and the option rights of the other shareholders and, alternatively, the corporation, to purchase such shares. Section 2.1 establishes the procedure for voluntary transfers and applies when a shareholder "desire[s] to sell, transfer, or otherwise dispose of all or any of his shares of stock."  It requires advance written notice to the corporation and the other shareholders and affords the other shareholders a first option to purchase the shares in accordance with the terms set forth in the agreement.  Section 2.2 governs transfers triggered by specified events, including termination of employment from the corporation.  Upon the occurrence of such an event, section 2.2 affords the remaining shareholders a first option to purchase the affected shareholder's shares, just as in the immediately preceding provision governing voluntary transfers of shares. Pertinent to this appeal, section 2.2 provides:

"Upon the happening of any of the following events, the other Shareholders shall have the first option to purchase all or any number of shares of the affected Shareholder on a pro rata basis:

*** 

- 4 -

(b) The termination of a Shareholder's employment with the Corporation, whether by retirement before age or by voluntary or involuntary withdrawal **(this provision shall apply to TOLLAKSEN who is an employee of the Corporation);**" (Emphasis in original).[2]

¶ 9     Section 2.3 provides that if the other shareholders elect to purchase less than all or none of the affected shareholder's shares as contemplated under either section 2.1 or 2.2, or if they fail to exercise their option within 30 days after receiving notice, the corporation itself "shall have the option to purchase all or any number of shares of the affected Shareholder" at the price and upon the terms and conditions set forth in section three.

¶ 10    Section 2.4 provides that if the corporation elects to purchase none or less than all the shares offered to it, or fails to exercise its option within 30 days after receiving notice, the transfer restrictions imposed by section two "shall terminate," and the affected shareholder or his representative may offer any shares not purchased by the corporation to an outside purchaser.

¶ 11    In turn, section three governs the "Price and Terms of Sale" of the shareholder's shares of stock and provides that

"[t]he purchase price of a Shareholder's shares of stock shall be the net book value per share multiplied by the number of shares to be sold, such value to be determined on the date of delivery to the other Shareholders or the Corporation, by the Shareholder or his legal representative of the notice specified in Paragraph 1 or upon the happening of an event specified in Paragraph 2 of Section Two."

---

[2]The buy-sell agreement as to Critical contains the emphasized language pertaining to plaintiff but the agreement as to Power does not.

Section three further provides that, if the parties disagree as to the net book value of the shares, "such net book value shall be computed in accordance with the generally accepted accounting practices as consistently used by the Corporation in preparation of its financial statements and tax returns by an independent certified public accountant selected by the parties." If the parties cannot agree on an independent certified public accountant (CPA), each party shall select an independent CPA, and the "accountants so chosen shall choose an independent [CPA]," who "shall determine the net book value of the shares to be sold and purchased hereunder." (Emphasis omitted.) The buy-sell agreement as to Critical requires payment to the affected shareholder in a lump sum within one year, whereas the agreement as to Power requires payment in a lump sum within three years.

¶ 12 Section five, titled "Specific Performance," provides that specific performance shall be an enforceable remedy for the sale of an affected shareholder's shares. Also relevant is section ten, which requires the parties to perform any acts and execute and deliver any documents that are reasonably necessary to carry out the provisions of the buy-sell agreements.

¶ 13                              B.  Board Actions, Termination, and Redemption Notices

¶ 14 On April 2, 2016, the Boards of Directors of Critical and Power convened special meetings, which were attended by plaintiff and the individual shareholder defendants. The minutes of both meetings reflect a discussion regarding plaintiff's status as a shareholder and his request to sell his shares in the respective companies. At each meeting, plaintiff stated that he would not accept net book value for his shares and "insisted that he be paid a fair market value." According to the meeting minutes, plaintiff estimated the value of his shares in Power to be between $1.7 million and $2.3 million, but he "did not provide an estimate" for the value of his shares in Critical. The minutes further reflect that the individual shareholder defendants "all agreed that they would not agree" to purchase plaintiff's shares at fair market value. The meeting minutes state that "[m]any

- 6 -

options were discussed."  In addition to plaintiff's request that his shares be purchased at fair market value, the boards discussed enforcing the respective buy-sell agreements, which they observed set the purchase price at net book value.  The boards also considered a third option under which plaintiff's "employment with the company would terminate but he would remain as a shareholder of the corporation and receive his share of dividends if and when paid."

¶ 15    The Critical board meeting then adjourned without further action.  At the Power board meeting, however, "[a]fter a lengthy discussion," Ritter moved, and Stunkard seconded, that the president be authorized to terminate plaintiff's employment without further board action.  The motion passed, with Ritter, Hunter, and Stunkard voting in favor and Lenhart and plaintiff abstaining.

¶ 16    On September 21, 2016, Stunkard sent plaintiff a letter on Critical letterhead stating: "We are writing to advise you that we are terminating your employment with [Critical] and [Power] effective immediately."  That same day, each of the individual shareholder defendants executed written waivers of their first-option rights to purchase all or any of plaintiff's shares in Power and Critical, which the waivers specified became available "upon the termination of [plaintiff's] employment."

¶ 17    On September 23, 2016, Lionheart's counsel sent a letter to plaintiff enclosing the buy-sell agreements, confirming plaintiff's termination from both corporations effective September 21, 2016, quoting the option provisions in the agreements, and invoking each corporation's second-option right to purchase the shares on the ground that the remaining shareholders had waived their first-option rights.  The letter advised that the net book value of plaintiff's shares in Critical and Power was $263,167.80 and $206,670.77, respectively, and stated that the respective companies "will be purchasing Mr. Tollaksen's shares" for those amounts.  The letter further stated that, "[i]n

this regard," enclosed were redemption agreements, two assignments separate from certificate, and resignation letters for both entities resigning plaintiff "from all director and officer positions." The letter requested that plaintiff sign and return the documents at his earliest convenience. In closing, the letter also stated that the individual shareholder defendants "additionally request that [plaintiff] agree to resign any positions he has with Lionheart Real Estate Limited Liability Limited Partnership and relinquish his ownership interest in such entities." Lionheart's counsel invited plaintiff to contact him directly to discuss the matter further.

¶ 18    In addition to effectuating the transfer and redemption of plaintiff's shares, the enclosed redemption agreements imposed several additional obligations on plaintiff that were not contained in the buy-sell agreements. Among other things, the redemption agreements required plaintiff to: (1) resign from all director and officer positions; (2) agree to certain restrictive covenants, including two-year covenants not to compete, solicit Lionheart's customers, or employ or solicit their employees; and (3) acknowledge that Lionheart had "required that [plaintiff] make the covenants *** as a condition of [their] obligations to consummate the transactions contemplated hereby." The redemption agreements also required plaintiff to indemnify Lionheart for any losses they may incur due to a breach of those covenants.

¶ 19    On December 23, 2016, Lionheart's counsel sent a letter to plaintiff advising that plaintiff had previously been informed of "the intention of [Lionheart] to redeem his shares at net book value" pursuant to the buy-sell agreements and noting that plaintiff had not yet surrendered his shares. The letter further stated that "[w]hile certain discussions have taken place regarding resolution of this matter, they have not been productive." Counsel indicated that, therefore, Lionheart had instructed him to proceed with the redemptions and demanded that plaintiff surrender his shares in exchange for payment of $263,167.80 as to Critical and $206,670.77 as to

Power, to be paid in lump sums. The letter further advised that if the redemption was not accomplished within 14 days, or another satisfactory resolution reached, Lionheart would take whatever action necessary to enforce the buy-sell agreements.

¶ 20                                    C. Litigation History

¶ 21    On January 20, 2017, plaintiff, individually and derivatively as a shareholder of the Lionheart entities, filed a three-count complaint against the individual shareholder defendants and the Lionheart entities. He alleged that Lionheart wrongfully terminated his employment as part of an "illegal 'freeze out' " designed to force him out as shareholder, deprive him of the fair value of his shares, permit the individual shareholder defendants to use corporate funds to enhance the value of their own interests at his expense, and to deny him payments to which he was entitled. Plaintiff alleged three causes of action: shareholder oppression in violation of section 12.56(a)(3) of the Business Corporation Act of 1983 (805 ILCS 5/12.56(a)(3) (West 2016)) (count I), breach of fiduciary duty (count II), and unjust enrichment (count III).

¶ 22    On December 5, 2017, Lionheart filed a one-count counterclaim seeking specific performance of the buy-sell agreements and an order compelling plaintiff to tender his shares for redemption at net book value. It alleged that, prior to September 21, 2016, plaintiff was considered an employee of both corporations and received substantial salary and benefits from each, despite performing "no services for either company." It contrasted his conduct with that of the individual shareholder defendants, who Lionheart asserted participated in the day-to-day operations of either or both entities and devoted their time, effort, energy, and expertise, whereas plaintiff "did none of these things." Lionheart further alleged that plaintiff was terminated on September 21, 2016, which constituted a triggering event under section 2.2(b) of the buy-sell agreements; that the individual shareholder defendants waived their purchase options pursuant to section 2.2; and that

it therefore possessed an "absolute and unconditional option to purchase [plaintiff's] shares of stock at their respective net book values"—$263,167.80 as to Critical and $206,670.77 as to Power. Lionheart attached to its counterclaim copies of plaintiff's termination letter, the buy-sell agreements, written waivers of the individual shareholder defendants' first-option rights, and the September 23, 2016, letter. Lionheart further emphasized that the letter enclosed "Redemption Agreements, Assignments Separate from Certificate[,] and Resignation Letters to be executed by [plaintiff]."

¶ 23   On December 6, 2021, Lionheart moved for summary judgment on its counterclaim. In identifying what it characterized as undisputed material facts, Lionheart asserted that the buy-sell agreements were valid, had not been amended in accordance with their terms, remained in full force and effect at all relevant times, and that Lionheart gave notice and demanded to exercise the option rights to purchase plaintiff's shares via the September 23, 2016, and December 23, 2016, correspondence to plaintiff. It further relied on plaintiff's own testimony that he was an at-will employee who was terminated in September 2016 and had no expectation of permanent employment. Lionheart also asserted that plaintiff acknowledged that, upon termination, he would be paid net book value for his shares if the buy-sell agreements were not amended, and that there was no misunderstanding or confusion on that point. As in its counterclaim, Lionheart argued that plaintiff's termination triggered section 2.2(b) of the buy-sell agreements and, because the individual shareholder defendants had waived their option rights, plaintiff was "required to sell his shares in [Lionheart] at net book value." Lionheart further contended that summary judgment was warranted under principles of equity because, in 2015, plaintiff approved and executed documents enforcing section 2.2(b) of the buy-sell agreement as to Power against a former shareholder, Orsini, whose employment had been terminated and who was thereby obligated to sell his Power shares

for net book value. Lionheart asserted that plaintiff should be held to the same provisions that he, himself, enforced against Orsini just one year before plaintiff's own termination, and that Lionheart reasonably expected that the agreements would be applied consistently.

¶ 24 On June 30, 2023, plaintiff moved for leave to file affirmative defenses to Lionheart's counterclaim. In his attached proposed amended answer, plaintiff sought to assert six affirmative defenses: (1) Lionheart failed to satisfy conditions precedent to exercising its option rights; (2) Lionheart's attempted exercise of the options was *ultra vires*; (3) Lionheart failed to tender payment as required; (4) Lionheart improperly calculated the net book value of the shares; (5) the buy-sell agreements are vague; and (6) unclean hands. On July 14, 2023, plaintiff also sought leave to file an amended complaint asserting 17 causes of action. The proposed complaint included several new causes of action not raised in his original complaint and added an additional defendant, Lionheart Real Estate Limited Liability Limited Partnership.

¶ 25 On October 10, 2023, the circuit court denied both motions, stating "I don't know that this horse needs to be beaten any deader than it is." The court observed that the case was "old," rejected plaintiff's arguments, and characterized the proposed amended pleadings as nothing more than a dilatory "Hail Mary attempt to further complicate the litigation."

¶ 26 On December 22, 2023, plaintiff filed a cross-motion for summary judgment on Lionheart's counterclaim. He argued that he was entitled to judgment as a matter of law because: (1) Lionheart's "attempted acceptance of the options" under the buy-sell agreements constituted a counteroffer because the proposed redemption agreements imposed conditions beyond the buy-sell agreements, and he rejected the counteroffer; (2) Lionheart's attempted exercise of the options was *ultra vires*; (3) Lionheart failed to perform all conditions precedent to the valid exercise of the options, including the failure to tender payment; and (4) Lionheart breached the buy-sell

agreements by improperly calculating the net book value of his shares and rendered it impossible for either party to properly determine net book value.

¶ 27    On March 20, 2024, the circuit court granted Lionheart's motion for summary judgment on its counterclaim and denied plaintiff's cross-motion for summary judgment on that counterclaim. In explaining its ruling, the court characterized the matter as "very straightforward," but that plaintiff had "conflat[ed] his contractual obligation to sell his shares with what he wants to characterize as an option to purchase." The court found that the terms of the buy-sell agreements clearly "triggered [his] obligation [under the buy-sell agreements] to sell his shares to the shareholders or to the entities at net book value." It further found that this was a preexisting contractual obligation and not a contingent offer and, therefore, the authorities relied on by plaintiff were "not informative in any manner." Additionally, the court found that Lionheart's proposed redemption agreements were not counteroffers but were instead "attempts to clarify the relationships of the parties," which did not alter their contractual obligations. It also rejected plaintiff's argument that Lionheart failed to satisfy conditions precedent, explaining that, under the Critical and Power buy-sell agreements, payment was not due until one year and three years, respectively, after acceptance of the purchase option, but that plaintiff filed suit before either payment obligation became due. Finally, the court rejected plaintiff's contention that Lionheart's attempted exercise of the redemption rights was *ultra vires*, because the agreement did not require board approval for the exercise of those rights. Therefore, the court concluded that no genuine issue of material fact existed as to plaintiff's obligation to sell his shares or Lionheart's right to purchase them, and it ordered plaintiff to tender all his shares in Critical and Power to the respective corporate defendants in exchange for payment of the shares' net book value. The court granted the parties 30 days to agree upon the net book value of plaintiff's shares and provided that,

if they were unable to agree, they were required to report to the court the name of their chosen CPA in accordance with section three of the agreements.

¶ 28    On April 4, 2024, counsel for Lionheart provided a proposed valuation for plaintiff's shares, as determined by their retained expert: $279,000 for his shares in Critical and $181,000 for his shares in Power.  Plaintiff thereafter "failed to respond much less agree to the Net Book Values proposed by [Lionheart] by the Court's April 19, 2024[,] deadline."

¶ 29    On April 24, 2024, the individual shareholder defendants moved for summary judgment on plaintiff's complaint.  They argued that his termination was not wrongful, emphasizing his deposition testimony that he was an at-will employee who lacked authority over personnel decisions.  They further contended that the forced redemption of his shares at net book value was contractually required, as the trial court determined in granting Lionheart's motion for summary judgment for specific performance on its counterclaim on March 20, 2024.  Moreover, the individual shareholder defendants asserted that their compensation packages were not excessive, as alleged in the complaint, because plaintiff acknowledged during his deposition that they should be paid more than him because "they were actually doing the day-to-day operation work" at Critical, and his admission that his salary at Power had been identical to that of the other shareholders.  They further asserted that, because his termination triggered his obligation to sell his shares, his continued status as a shareholder resulted solely from his refusal to do so, and he therefore lacked any basis to object to post-termination compensation decisions.  In short, the individual shareholder defendants asserted that summary judgment in their favor was warranted because each of plaintiff's claims were defeated by either (1) his admissions at deposition, (2) the trial court's March 20, 2024, order requiring plaintiff to surrender his shares at net book value, or

(3) equitable principles precluding plaintiff "from obtaining any remedy as a shareholder after his own wrongful refusal to surrender his shares upon [Lionheart's] lawful demand that he do so."

¶ 30     On May 10, 2024, the circuit court noted that the parties had not reached an agreement regarding the determination of the net book value of plaintiff's shares in either corporate entity. The court therefore entered an order effectuating section three of the buy-sell agreements and establishing deadlines for the valuation process. The court ordered that net book value be computed using generally accepted accounting practices and directed each party to propose three to five independent CPAs to the other for consideration. Consistent with section three of the agreements, the order further provided that, if the parties were unable to agree as to an independent CPA to compute net book value, plaintiff and each entity would select an independent CPA, and "the accountants so chosen shall choose an independent" CPA. Regardless of which process was used, the court required that the final determination of net book value for each entity be submitted for its consideration on July 19, 2024. The court further ordered that each entity pay plaintiff in a lump sum payment—within one year of the final determination of net book value for Critical and three years for Power.

¶ 31     On May 31, 2024, Lionheart filed a petition for rule to show cause alleging plaintiff had failed to comply with the court's March 20, 2024, and May 10, 2024, orders.

¶ 32     On June 7, 2024, the trial court found that Lionheart had made a *prima facie* showing that plaintiff violated those orders and issued a rule to show cause. The order further provided that the rule would be discharged if plaintiff provided the entities with his chosen independent CPA by June 25, 2024. Plaintiff thereafter selected an independent CPA by that date, and the two chosen independent CPAs selected a third independent CPA as contemplated in the buy-sell agreements. The June 7, 2024, order further provided that the three accountants would determine the net book

value of plaintiff's shares as of his termination on September 21, 2016. The accountants were directed to submit their report to the parties by August 9, 2024, after which the parties could thereafter file a motion asking the court to adopt and ratify the accountants' report.

¶ 33 On August 16, 2024, following argument by counsel for the individual shareholder defendants, the court granted summary judgment in their favor on plaintiff's claims against them. In explaining its ruling, the court stated that it viewed plaintiff's termination as the "linchpin" of his complaint, reasoning that, absent wrongful termination, "all of plaintiff's remaining claims fall." Because plaintiff admitted that he was an at-will employee and that he was subject to termination without cause, the court concluded that the termination itself was lawful. From that premise, the court concluded that all of plaintiff's claims, including shareholder oppression in violation of section 12.56(a)(3) of the Act, breach of fiduciary duty, and unjust enrichment, failed as a matter of law against the individual shareholder defendants. It additionally found that "[t]here was no breach of fiduciary duty," and, although Lionheart "did benefit," it "did not unjustly benefit." The court again pointed to the buy-sell agreements and emphasized that the parties "contemplated [Lionheart] would benefit," and that, upon his termination, plaintiff would be entitled to "just—just, I repeat—his net book value." It also found that no fiduciary duty was breached in what it described as a "clumsy attempt to settle [plaintiff's] buyout," reasoning that Lionheart and the individual shareholder defendants were merely "attempting to get a good deal on a buyout with a former shareholder."

¶ 34 The trial court continued that, even though the individual shareholder defendants retained ownership of the companies and, by comparison, received "an exceedingly better deal [than plaintiff]," that disparity "doesn't even get close to breaching a duty," because "the fiduciaries offered the plaintiff all he was entitled" under the buy-sell agreements. It explained that the

fiduciary obligation that the individual shareholder defendants owed plaintiff was governed by the buy-sell agreements, which entitled him to net book value upon termination. According to the court, "[t]hat was the definition of completing and following through with their fiduciary duty." The court further found that the individual shareholder defendants were entitled to summary judgment on plaintiff's unjust enrichment claim because they owed him no fiduciary duty after his termination. The trial court likewise granted Lionheart's motion to ratify the accountants' computation of the net book value of plaintiff's shares, fixing that value at $383,064 for Critical and $257,179 for Power. It ordered the corporations to remit those sums to plaintiff in lump-sum payments by September 16, 2024, and directed that, upon receipt of payment, plaintiff surrender his stock certificates.

¶ 35    After the trial court announced its ruling, plaintiff requested a trial date "with respect to the claims against" Lionheart. The trial court replied that it believed it had "dealt with all of the claims against Lionheart" and asked plaintiff which claims remained. Plaintiff emphasized that, unlike the individual shareholder defendants, Lionheart had not filed a motion for summary judgment on his complaint. The court then asked plaintiff how Lionheart could be liable if the individual shareholder defendants were not liable based on the same issues. Plaintiff responded that he had post-termination wage claims against Lionheart based on implied contracts of law, asserting that he "provided services to the entities as an officer and director *** understanding he was going to be compensated and he wasn't." He further asserted that Lionheart had failed to pay him a $125,000 bonus that they had agreed to pay, maintaining that "[t]hose are corporate claims, not individual shareholder claims." The trial court then granted Lionheart leave to file a motion for summary judgment within seven days and established a briefing and hearing schedule.

¶ 36     Four days later, on August 20, 2024, plaintiff filed a motion to voluntarily dismiss his claims against Lionheart without prejudice pursuant to section 2-1009 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1009 (West 2022)).  He emphasized that neither of the Lionheart entities had filed any motion that, if granted, could result in a final disposition of his complaint. He also emphasized that there were no pending third-party complaints and that the trial court's orders of March 20, 2024, and August 16, 2024, had disposed of Lionheart's counterclaim, leaving only the enforcement of the August 16, 2024, order.

¶ 37     On August 22, 2024, plaintiff moved to stay enforcement of the court's August 16, 2024, order and to establish an escrow account to hold his Lionheart shares and the ratified net book value of those shares into escrow "until the parties have exhausted their rights to appeal."  He argued that requiring him to accept payment and transfer his shares "could jeopardize his rights on appeal and raise issues under the doctrines of waiver and release of errors."

¶ 38     On August 23, 2024, Lionheart filed a motion seeking a finding of adjudication of all claims against all parties or, alternatively, for summary judgment on plaintiff's verified complaint and for sanctions.

¶ 39     On August 28, 2024, the circuit court denied plaintiff's motion to voluntarily dismiss the complaint, noting that Lionheart's motion for a finding of adjudication of all claims or, in the alternative, for summary judgment, was a dispositive motion that remained pending.  The court explained that, "where we are in this litigation, [plaintiff] does not now have an opportunity to try to short-circuit resolution of everything on the merits by attempting to nonsuit."  In open court, counsel for Lionheart then attempted to tender lump sum payments for plaintiff's shares, but plaintiff's counsel refused to accept the checks and asked to proceed with a hearing on his motion

to stay enforcement. The trial court granted Lionheart 12 days to file its response to the motion to stay and set a hearing date.

¶ 40 On September 12, 2024, following argument of counsel, the trial court denied plaintiff's motion to stay enforcement of its August 16, 2024, order directing him to tender his shares for redemption at net book value. Counsel for Lionheart again attempted to tender two cashier's checks to plaintiff's counsel representing the Lionheart entities' purchase of the shares at net book value. Upon presentment of the checks to plaintiff's counsel, the court stated, "[t]hey're yours and you've been ordered to surrender the shares, and I expect that to happen." In response, plaintiff's counsel stated, "[t]hey're going to sit on the table. I am not taking them with me for the reasons that we've said. *** Just for the record, I have not touched the envelopes that have been placed on the desk in front of me." In its written order, the court found that Lionheart had tendered payment to plaintiff in open court and that plaintiff's refusal to accept the checks did not negate that tender.

¶ 41 On September 23, 2024, Lionheart filed a second petition for rule to show cause, asserting that plaintiff failed to comply with the August 16, 2024, order requiring him to accept lump-sum payments of $383,064 from Critical and $257,179 from Power, and thereafter surrender his shares for redemption.

¶ 42 On October 10, 2024, the circuit court held a hearing on (1) Lionheart's motion for a finding of adjudication of all claims against all parties or, in the alternative, for summary judgment on plaintiff's complaint, and (2) Lionheart's petition for rule to show cause. It then entered an order clarifying that, when it granted Lionheart's motion for summary judgment on its counterclaim for specific performance, it "found that neither [Lionheart] nor the individual [shareholder] defendants had committed any wrongdoing and therefore no claims remained against [Lionheart] at that time."

It further clarified that, therefore, "all claims against [Lionheart] and the individual defendants were adjudicated as of August 16, 2024." In the same order, the court also found plaintiff in civil contempt of court and imposed a sanction of $100 per day, payable to Lionheart, and ordered plaintiff to pay $1,900 in attorney fees to Lionheart's counsel. The order indicated that plaintiff could purge himself of contempt by tendering his shares to Lionheart.

¶ 43    Plaintiff timely filed a notice of appeal.

¶ 44                                    II. ANALYSIS

¶ 45    Plaintiff raises six issues on appeal, namely that the trial court erred in: (1) denying his motion for summary judgment on Lionheart's counterclaim for specific performance of the buy-sell agreements; (2) granting Lionheart's motion for summary judgment on its counterclaim; (3) granting summary judgment in favor of the individual shareholder defendants on plaintiff's complaint; (4) granting summary judgment in favor of Lionheart on plaintiff's complaint; (5) denying plaintiff leave to file an amended complaint and affirmative defenses to Lionheart's counterclaim; and (6) denying plaintiff's motion to stay enforcement of its order requiring him to tender his shares to Lionheart for redemption.

¶ 46    Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2024). "The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a triable question of fact exists." *West Bend Mutual Insurance Co. v. TRRS Corp.*, 2022 IL App (2d) 210506, ¶ 13. In evaluating whether a genuine issue of material fact exists, the court must construe the pleadings and evidentiary material strictly against the movant and liberally in favor of the opponent. *In re Marriage of Brubaker*, 2022 IL App (2d) 200160,

¶ 22. A triable issue of fact exists where there is a dispute as to a material fact or where, although the facts are not in dispute, reasonable minds might differ in drawing inferences from those facts. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). We review *de novo* a trial court's decision to grant summary judgment (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992)), meaning we give no deference to the trial court's determination, but instead "consider anew the pleadings, affidavits, depositions, admissions, and exhibits on file to determine whether the trial court's decision was correct" (*Jackson v. Graham*, 323 Ill. App. 3d 766, 779 (2001)). We likewise review *de novo* the interpretation of a contract. *Zahdan v. Frontline Business Enterprise, Inc.*, 2024 IL App (1st) 221351, ¶ 31. Summary judgment is a drastic measure that should be granted only when the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986).

¶ 47                           A. Interpretation of the Buy-Sell Agreements

¶ 48     As a threshold matter, we must determine whether the buy-sell agreements are ambiguous because, as applicable here, the buyout provisions contained in the agreements become operative only upon the occurrence of a triggering event.

¶ 49     Plaintiff argues on appeal that the agreements are ambiguous and therefore present questions of fact that cannot be resolved on a motion for summary judgment. Specifically, he points to the phrase "involuntary withdrawal," as that term is used in section 2.2(b), and contends that the phrase is susceptible to more than one reasonable interpretation, rendering it debatable whether his termination triggered the option provisions in section two.

¶ 50     In construing a contract, our primary objective is to give effect to the parties' intent at the time it was formed. *Camelot, Inc. v. Burke Burns & Pinelli, Ltd.*, 2021 IL App (2d) 200208, ¶ 48. The best indicator of that intent is the language of the contract itself. *Board of Directors of Olde*

*Salem Homeowners' Association v. Secretary of Veterans Affairs*, 226 Ill. App. 3d 281, 286 (1992). Courts traditionally apply the "four corners rule" and examine the language of the contract alone to ascertain the intent of the parties. *West Bend Mutual Insurance Co.*, 2013 IL App (2d) 120814, ¶ 19. If the language is clear and unambiguous, it must be given its plain, ordinary, and popularly understood meaning (*Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011)), and the parties' intent must be determined solely from that language without resort to extrinsic evidence (*Camelot*, Inc., 2021 IL App (2d) 200208, ¶ 48). Courts should not interpret a contract that is contrary to the plain and obvious meaning of the language. *Kokinis v. Kotrich*, 74 Ill. App. 3d 224, 230 (1979). In interpreting a contract, courts must also consider the agreement as a whole and construe each provision in light of the others. *Thompson*, 241 Ill. 2d at 441. A contract term is not ambiguous merely because the parties disagree on its meaning, but rather, ambiguity exists where the language is susceptible to more than one reasonable interpretation. *Sanders v. Illinois Union Insurance Co.*, 2019 IL 124565, ¶ 23. The question of whether a contract is ambiguous is a question of law that we review *de novo*, meaning we give no deference to the trial court's determination. *Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002).

¶ 51     With these well-settled principles in mind, we turn to the pertinent language of the buy-sell agreements. Section two governs the "Sales and Purchase of Shares." Section 2.1 establishes the procedure for voluntary transfers and applies when a shareholder "desire[s] to sell, transfer, or otherwise dispose of all or any of his shares of stock." It requires advance written notice to the corporation and the other shareholders and affords the other shareholders a first option to purchase the shares in accordance with the terms in the agreement.

¶ 52     Section 2.2 governs transfers triggered by certain specified events, such as termination of employment from the corporation, total and permanent disability, insolvency, or death. Once such

a triggering event occurs, it affords the remaining shareholders a first option to purchase the affected shareholder's shares. As relevant to plaintiff's ambiguity argument, section 2.2 of the Critical buy-sell agreement provides:

> "Upon the happening of any of the following events, the other Shareholders shall have the first option to purchase all or any number of shares of the affected Shareholder on a pro rata basis:
>
> \*\*\*
>
> (b) The termination of a Shareholder's employment with the Corporation, whether by retirement before age or by voluntary or involuntary withdrawal **(this provision shall apply to TOLLAKSEN who is an employee of the Corporation);**" (Emphasis in original.)

Section 2.2(b) of the Power buy-sell agreement lacks the emphasized language referencing plaintiff but is otherwise identical.

¶ 53    We determine that section 2.2(b) of the buy-sell agreements is not ambiguous. Inserting the operative language of subpart (b) into section 2.2, the agreements provide that "[u]pon the [termination of a Shareholder's employment with the Corporation \*\*\*], the other Shareholders shall have the first option to purchase all or any number of shares of the affected Shareholder on a pro rata basis." Plaintiff's reliance on the term "involuntary withdrawal" fails because it overlooks the structure of section 2.2(b). Grammatically and syntactically, "termination of a Shareholder's employment with the Corporation" is the operative event, and the phrases that follow—including "retirement before age," and "voluntary or involuntary withdrawal"—are illustrative examples rather than limiting conditions, as reflected in the use of the phrase "whether by." Nothing in section 2.2(b) suggests that those phrases create independent triggering events, each resulting in a

distinct contractual consequence. Rather, the provision identifies a single triggering event, termination, and makes clear that the option is triggered regardless of how termination occurs.

¶ 54 Plaintiff's only textual basis for claiming ambiguity is that the term "involuntary withdrawal" is not expressly defined in the agreements. However, a term is not ambiguous simply because it is undefined. *Chatham Corp. v. Dann Insurance*, 351 Ill. App. 3d 353, 358 (2004). This is particularly true where the undefined term has a plain and ordinary meaning, such that the term should be enforced as written. *Id.* Apart from the observation that the term "involuntary withdrawal" is undefined, plaintiff's argument rests almost entirely on deposition testimony concerning the parties' understanding of the buy-sell agreements at the time they were executed. Specifically, he contends that Stunkard testified he did not understand the scope of section 2.2, that Lenhart did not believe when he signed the agreements that his shares could be forcibly sold upon termination, and that Ritter did not read the agreements to permit termination without cause followed by a compelled sale of his shares. That reliance, however, is misplaced. Again, in interpreting a contract, courts first look to the four corners of the agreement, and if the words are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. The testimony plaintiff emphasizes constitutes extrinsic evidence, which may be considered only if the contract is ambiguous. *Gassner v. Raynor Manufacturing Co.*, 409 Ill. App. 3d 995, 1006 (2011). Because section 2.2 is unambiguous, such evidence is not properly considered in interpreting the agreements.

¶ 55 Even if we were to consider that testimony, plaintiff either misconstrues the testimony or overstates its significance. Although Stunkard testified that there was no "specific meaning" for the term "involuntary withdrawal," he clarified that the phrase could "cover a broad range of meanings," including that a "shareholder would be removed against their objection," such as for

failing to contribute towards the stability and improvement of the company. Ritter and Lenhart, by contrast, testified that at the time they signed the agreements, they did not appreciate that they could be fired without cause and forced to sell their shares. Both indicated that they did not make that connection until a wealth management advisor later brought it to their attention in connection with their dealings concerning Orsini. Ritter conceded, however, that he "didn't look extremely close at [the buy-sell agreements] because it was a boilerplate document," described himself as "pretty trusting," and admitted that he was "not a super detailed person." He also testified that "it was a real eye opener" when the shareholders later applied the Power buy-sell agreement to Orsini. Lenhart similarly testified that he could not recall recognizing, at the time he signed the agreements, that termination could result in the forced sale of his shares. Their testimony, however, reflects subjective misunderstanding, which does not alter the objective meaning of unambiguous language in the agreements. See *Carey v. Richards Building Supply Co.*, 367 Ill. App. 3d 724, 726-27 (2006) (explaining that "subjective intentions are irrelevant; rather, the pertinent inquiry focuses upon the objective manifestations of the parties, including the language they used in the contract").

¶ 56    In a related argument, plaintiff contends that the buy-sell agreements were "modified" to substitute a fair market value standard for net book value. He relies on Lenhart's deposition testimony that, in early 2015, the shareholders discussed revising the agreements to provide for a fair market valuation, and that "it got to the point where we and most of the others agreed." Plaintiff also points to a January 22, 2015, email that he circulated to the individual shareholder defendants, as well as Orsini, with the subject line: "Owners Meeting Notes Jan. 21, 2015," in which plaintiff wrote: "Scott Orsini noted that the current Buy & Sell was based on net book value. Pete Stunkard noted the current Buy & Sell needs to be rewritten to reflect Fair Market Value."

¶ 57    This argument plainly fails as a matter of law. The cited testimony and evidence reflect, at most, discussions among the shareholders about potentially revising the agreements in the future. Section seven of the buy-sell agreements governs amendment and provides that "[t]his Agreement shall not be amended or modified except by a written agreement of the Corporation and all of its Shareholders." Neither Lenhart's testimony nor plaintiff's email, which notes that the agreements "need[] to be rewritten," suffice to establish a written, binding agreement in accordance with section seven. Rather, they confirm that no modification had yet occurred. Accordingly, the buy-sell agreements are not ambiguous and remained in full force and effect as written.

¶ 58                    B. Application of the Buy-Sell Agreements

¶ 59    Having determined that the buy-sell agreements are unambiguous and remained in effect as written, we next consider their application. Plaintiff concedes on appeal that Lionheart terminated his employment by written correspondence on September 21, 2016, when Stunkard sent him a letter stating that "we are terminating your employment with Lionheart Critical Power Specialists, Inc., and Lionheart Power Systems, Inc. *** effective immediately." We also observe that, in his opening brief, plaintiff captions a section of his statement of facts: "Lionheart terminates Tollaksen's employment," and plaintiff reiterates that fact elsewhere in his brief. Plaintiff makes no argument that he was not an employee under the buy-sell agreements or that he somehow was not subject to the agreements. Instead, he tangentially notes that the termination letter did not specify a reason for his termination, including whether it was "for cause" or based on an "involuntary withdrawal," as that term is used in the agreements. Notwithstanding, the mere fact of termination plainly constituted a triggering event under section 2.2, without regard to the underlying reason, as discussed above.

- 25 -

¶ 60 Because plaintiff's termination constituted a triggering event under the buy-sell agreements, the relevant question is whether Lionheart effectively exercised its option rights in accordance with the buy-sell agreements.

¶ 61 Plaintiff argues on appeal that Lionheart's "attempted acceptance of the options" was legally deficient because it introduced additional terms not contained in the buy-sell agreements and conditioned the exercise of the options on plaintiff's agreement to those terms. In support, plaintiff points to the September 23, 2016, correspondence and accompanying documents sent by Lionheart following his termination, which included redemption agreements, resignation letters for his positions as an officer and director in both entities, and a request that he resign any positions with Lionheart Real Estate Limited Liability Limited Partnership and relinquish his ownership interest in that entity. Plaintiff places particular emphasis on the redemption agreements, which he emphasizes contain additional terms that do not appear in either buy-sell agreement, including the requirements that plaintiff: (1) resign from all director and officer positions; (2) agree to certain restrictive covenants, including two-year covenants not to compete, not to solicit Lionheart's customers, and not to employ or solicit their employees; and (3) indemnify Lionheart for any losses incurred due to a breach of those covenants. Plaintiff further highlights language in the redemption agreements purporting to condition Lionheart's obligation to consummate the share redemptions on plaintiff's agreement to these restrictive covenants. In plaintiff's view, because Lionheart expressly tied its exercise of the redemption options to plaintiff's agreement to these additional terms, the September 23, 2016, letter and its enclosures constituted a counteroffer that plaintiff was free to reject or, alternatively, an offer to negotiate. Plaintiff reasons that, in either event, he was not obligated to surrender his shares because Lionheart's "attempted acceptance" of its option did not mirror the terms of the buy-sell agreements.

¶ 62 In response, Lionheart disputes plaintiff's framing, asserting that there is "no such thing as 'acceptance of an option,' " and contending that options are either exercised or not. They dispute that this case involves a situation in which plaintiff first "offered" to sell his shares and Lionheart's response, by imposing additional terms, operated as a counteroffer. Instead, it contends that plaintiff's termination triggered a preexisting contractual obligation under the buy-sell agreements to sell his shares. Additionally, Lionheart emphasizes that only "two conditions *** must be met for [the Lionheart entities] to exercise their options" under the buy-sell agreements: (1) a shareholder must either desire to sell his shares or an enumerated event that triggers the sale of shares must occur; and (2) the remaining shareholders fail to exercise their first-option rights to purchase the departing shareholder's shares within 30 days. In Lionheart's view, both preconditions were satisfied, because (1) plaintiff's termination "triggered a sale of his shares," and (2) the remaining shareholders "failed to exercise their options." Accordingly, Lionheart maintains that it is entitled to exercise, and did exercise, its options to purchase plaintiff's shares by sending the September 23, 2016, letter, and that no "acceptance" by plaintiff was required.

¶ 63 Because plaintiff and Lionheart filed cross-motions for summary judgment, they "agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Nevertheless, it is well settled that the parties' view of the facts is not binding on the reviewing court, because "the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.* "Since the entry of a summary judgment is not a matter committed to the discretion of the trial court, a reviewing court must independently examine the evidence presented in support of and in opposition to a motion for summary judgment [citation] and review

- 27 -

the decision of the trial court *de novo* [citation]." *Groce v. South Chicago Community Hospital*, 282 Ill. App. 3d 1004, 1006 (1996).

¶ 64    Our independent review of the record reveals that the undisputed facts establish that Lionheart failed to effectively exercise its second-option rights to purchase plaintiff's shares in strict conformity with the buy-sell agreements. This issue turns on the application and effect of the buy-sell agreements following plaintiff's termination, which we examine in greater detail below.

¶ 65    As noted, section two of the agreements govern the "Sales and Purchase of Shares." Section 2.1 establishes the procedure for share transfer when a shareholder "desire[s] to sell, transfer, or otherwise dispose of all or any of his shares of stock." It requires advance written notice to the corporation and the other shareholders and grants the other shareholders a first option to purchase the shares in accordance with the agreement's terms.

¶ 66    By contrast, section 2.2 applies upon the occurrence of a specified triggering event, such as termination of a shareholder's employment with the corporation. In such circumstances, just as in section 2.1, the remaining shareholders are granted a first option to purchase the affected shareholder's shares. Section 2.2 provides, in pertinent part:

> "2. Upon the happening of any of the following events, the other Shareholders shall have the first option to purchase all or any number of shares of the affected Shareholder on a pro rata basis:
>
> ***
>
> (b) The termination of a Shareholder's employment with the Corporation, whether by retirement before age or by voluntary or involuntary withdrawal **(this**

**provision shall apply to TOLLAKSEN who is an employee of the Corporation);**

* * *

In the event the other Shareholders elect to purchase all or less than all of the affected Shareholder's shares of stock, the affected Shareholder or his representative shall sell to the other Shareholders the number of shares elected to be purchased by the other Shareholders at the price fixed and upon the terms and conditions set forth in Section Three of this Agreement. In the event a Shareholder chooses to purchase less than all of his pro rata portion of the affected Shareholder's shares, the other Shareholders shall have the option to purchase, on a pro rata basis, those shares not purchased by that Shareholder."

(Emphasis in original.)

¶ 67 Section 2.3 of the buy-sell agreements provide the corporation with a second option to purchase the shares if the other shareholders either do not purchase all of the affected shareholder's shares, decline to purchase any of those shares, or fail to exercise their option within 30 days. Specifically, it provides:

"3. In the event the other Shareholders elect to purchase less than all or none of the affected Shareholder's shares of stock under Paragraphs 1 or 2 above, or if they fail to exercise the option to purchase within thirty (30) days after receiving notice of the option, the Corporation shall have the option to purchase all or any number of shares of the affected Shareholder not purchased by the other Shareholders at the price fixed and upon the terms and conditions set forth in Section Three of this Agreement."

¶ 68 The final subpart of section 2 provides that, if the corporation is unable or unwilling to purchase the shares, or fails to exercise its option within 30 days, the contractual restrictions on

the transfer of shares in section two terminate, and the affected shareholder may sell the shares to an outside purchaser. Specifically, section 2.4 provides:

> "4. In the event the Corporation is prohibited by the Illinois Business Corporation Act of 1983, as amended (herein referred to as "the BCA"), or any successor statute, from purchasing all or any number of the shares of the affected Shareholder, or if the Corporation elects to purchase none or less than all of the shares offered to it, or if the Corporation fails to exercise its option to purchase within thirty (30) days after it first receives the option to purchase, the restrictions upon the sale of such stock imposed by this Section Two shall terminate and the affected Shareholder or his representative shall be free to offer the shares of stock not purchased by the Corporation to an outside purchaser."

¶ 69    The law governing option agreements is well settled. An option is a unilateral contract wherein the owner of property, the optionor, gives another person, the optionee, the right to purchase the property at a fixed price within a fixed period. *Bruss v. Klein*, 210 Ill. App. 3d 72, 80 (1991). It consists of two basic components: (1) the optionor's unilateral offer to sell, which does not become a contract until it is accepted, and (2) an agreement to leave the offer open for a set time. *Id*. An option does not convey any present interest in property and does not obligate the optionee to purchase the property. Rather, an option gives the optionee the right, but not the obligation, to purchase the property at a fixed price within a specified time. See *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 567 (2011).

¶ 70    A binding contract for sale is created only when the option is "accepted and exercised according to its terms." *Bruss*, 210 Ill. App. 3d at 79. As our supreme court has explained,

> "[i]t is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an agreement or contract between the parties, must, in every

respect, meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed but exactly meeting them at all points and closing with them just as they stand." *Morris v. Goldthorp*, 390 Ill. 186, 195 (1945).

This concept is well recognized and has been repeatedly reaffirmed. *Michigan Wacker Associates, LLC v. Casdan, Inc.*, 2018 IL App (1st) 171222, ¶ 39 ("The acceptance of an offer contained in an option must be specific, certain, and unconditional"); *Central National Bank in Chicago v. Fleetwood Realty Corp.*, 110 Ill. App. 3d 169, 182 (1982); *Wentcher v. Busby*, 98 Ill. App. 3d 775, 783 (1981); *Seaberg v. American National Bank & Trust Co.*, 35 Ill. App. 3d 1065, 1072-73 (1976); *Epton v. CBC Corp.*, 48 Ill. App. 2d 274, 285 (1964). To effectively exercise an option, an "acceptance must meet and correspond to the terms of the offer exactly." *Central National Bank*, 110 Ill. App. 3d at 174 (citing *Morris*, 390 Ill. at 195); *Farley v. Roosevelt Memorial Hospital*, 67 Ill. App. 3d 700, 703 (1978) (noting the basic contract principle "that for the exercise of an option to be valid, the acceptance must be in the precise terms of the offer contained in the option").

¶ 71 In entering summary judgment in favor of Lionheart and ordering plaintiff to tender his shares for redemption in exchange for payment of net book value, the trial court, immediately after finding the agreements unambiguous, stated: "[t]he termination of employment triggered the buy-sell agreement. Accordingly, the September 21st, 2016, letter of termination triggered [plaintiff's] obligation to sell his shares to the shareholders or the entities at net book value," because it was a "pre-existing contractual obligation." In other words, the court concluded that plaintiff's termination triggered a fixed obligation to sell his shares—either to the remaining shareholders or to Lionheart. In so ruling, the court appears to have assumed that Lionheart had effectively exercised its option rights through the September 23, 2016, correspondence. Rather than address plaintiff's argument that Lionheart did not exercise its option rights in strict conformity with the

buy-sell agreements, the trial court effectively handwaved it, characterizing Lionheart's September 21, 2016, correspondence and the enclosed redemption agreements as merely a "clumsy attempt to settle [plaintiff's] buyout" and as "attempting to get a good deal." The court thus accepted the argument that, because plaintiff was terminated, plaintiff was "required to sell his shares." As noted, Lionheart defends the court's determination on appeal, arguing that plaintiff was obligated to sell his shares because his "employment termination triggered a sale of his shares under Section Two," and the individual shareholder defendants likewise argue on appeal that plaintiff's termination was "the event that triggers the mandatory redemption mechanics," and that, "[o]nce the termination occurred (the only contractually relevant fact), the contractual obligation to sell at net book value attached."

¶ 72    The trial court's error lies in its misapplication of the buy-sell agreements' plain language. Section two governs the disposition, if any, of a shareholder's shares—whether the shareholder desires to sell, transfer, or otherwise dispose of his shares (section 2.1), or whether a specified triggering event, such as employment termination, occurs (section 2.2). In either circumstance, the agreements provide that the "other shareholders shall have the first option to purchase all or any number" of the shares on a *pro rata* basis. Although termination certainly triggers the options provisions under section 2.2, nothing in that section automatically mandates a terminated shareholder to sell his shares. Instead, termination initiates a sequential set of options, each subject to prescribed time periods, first in favor of the remaining shareholders under section 2.2, and then, if unexercised, in favor of the corporation under section 2.3. By treating the occurrence of a triggering event as creating a fixed obligation to sell, the trial court essentially rewrote the buy-sell agreements to eliminate the option structure altogether. An option, however, is "a continuing

offer to sell" upon the terms and within the time fixed by the option and does not become a binding contract unless and until it is accepted in strict accordance with its terms. *Morris*, 390 Ill. at 192.

¶ 73    The arguments advanced by Lionheart on appeal, that plaintiff was "already contractually obligated to sell his shares *** upon his employment termination," and that plaintiff's "termination triggered a sale of his shares under Section Two," conflate the two conditions precedent to having a right to exercise the options in this case with the separate act of effectively *exercising* the corporate option.  The triggering of the option provisions alone does not consummate the transaction.  Instead, a party entitled to purchase must invoke the contractual mechanism in the manner required by the agreement.  Here, the buy-sell agreements make clear that, even if the remaining shareholders or the corporation hold options to purchase a departing employee's shares, that does not necessarily mean that a sale will be completed, because both the shareholders and the corporation may elect not to exercise their options.  Section 2.4 expressly contemplates that possibility, as it makes clear that if the options are not timely exercised, the restrictions imposed on the transfer of shares contained in the buy-sell agreements are lifted, and the affected shareholder is "free to offer the shares of stock not purchased *** to an outside purchaser."

¶ 74    Defendants rely on Lionheart's written correspondence, dated September 23, 2016, and December 23, 2016, in support of the assertion that Lionheart effectively exercised the option rights under the buy-sell agreements.  In their briefs, however, defendants fail to substantively address plaintiff's central contention that the redemption agreements introduced new, material terms not contemplated by the buy-sell agreements, thereby rendering the purported acceptance a counteroffer rather than a valid exercise of the option rights.  See, *e.g.*, *Wendy & William Spatz Charitable Foundation v. 2263 North Lincoln Corp.*, 2013 IL App (1st) 122076, ¶ 28 ("[w]hen a lease contains an option to purchase and such an option is accepted and exercised according to its

terms, it becomes a present contract for the sale of the property"); *Artful Dodger Pub, Inc. v. Koch*, 230 Ill. App. 3d 806, 811 (1992) ("An option, when accepted and exercised according to its terms, becomes a present contract for the sale of the premises"); *Bruss*, 210 Ill. App. 3d at 79 (observing that "only when an option is accepted and exercised according to its terms does it become a present contract"); *Central National Bank*, 110 Ill. App. 3d at 174-76 (1982) (holding lessee's conditional acceptance "subject to inspection" did not constitute a valid exercise of the option to lease additional space); *Fitz 223, LLC v. 225 W. Ontario Corp.*, 2025 Ill. App (1st) 210341-U, ¶ 45 ("A contract for sale is created only when the option is exercised, which is to say that the offer to sell is accepted according to its terms") (citing *Bruss*, 210 Ill. App. 3d at 79)).

¶ 75    The individual shareholder defendants describe the redemption agreements as "standard closing documents" and assert that plaintiff "failed to cooperate with the process" in fulfilling his "contractual obligation to sell his shares," but they do not meaningfully engage with this rule. Lionheart, for its part, quibbles over semantics, insisting that an option cannot be "accepted" but only "exercised," while overlooking that, in this context, the terms are functionally equivalent. Indeed, in their respective briefs, defendants fail to even acknowledge the restrictive covenants or the conditional nature of the redemption agreements.

¶ 76    When pressed at oral argument to address plaintiff's argument, defendants characterized Lionheart's September 23, 2016, letter as merely *requesting* that plaintiff execute the redemption agreements rather than conditioning its exercise of the options on plaintiff's assent to those agreements. On that view, Lionheart contends that it effectively exercised its option rights and then made separate, nonbinding requests that plaintiff resign from all director and officer positions, agree to two-year restrictive covenants not to compete or solicit Lionheart's customers, and indemnify Lionheart for any losses incurred due to a breach of those covenants.

¶ 77    The text of the redemption agreements, which were presented to plaintiff together with the September 23, 2016, letter, forecloses that characterization. The redemption agreements expressly provide that the restrictive covenants are conditions imposed by Lionheart on its exercise of the option rights, stating both that they "required that [plaintiff] make the covenants *** as a condition to [Lionheart's] obligations to consummate the transactions contemplated thereby," and that Lionheart "would not be entering into the transactions contemplated by this Agreement but for" those restrictive covenants. The redemption agreements cannot be read in isolation but must be considered together with the letter of September 23, 2016, with which they were transmitted. Read together, the documents make clear that Lionheart's purported exercise was conditioned on plaintiff's assent to additional, material terms, including post-sale restrictive covenants and indemnification obligations not contemplated by the buy-sell agreements. Because those terms would have materially altered the parties' rights, Lionheart's letter of September 23, 2016, is properly understood as either an invitation to negotiate plaintiff's surrender of his shares or a counteroffer. In either case, it does not constitute an effective exercise of Lionheart's option rights. See *Morris*, 390 Ill. at 195.

¶ 78    Further, the buy-sell agreements granted Lionheart a 30-day window in which to exercise its option rights. Contract formation is a question of law to be determined by the court. *Mulvey v. Carl Sandburg High School*, 2016 IL App (1st) 151615, ¶ 38. Once plaintiff moved for summary judgment on Lionheart's counterclaim for specific performance and identified the September 23, 2016, letter and accompanying redemption agreements in the record, thereby demonstrating that those documents imposed additional, material terms not contemplated by the buy-sell agreements, it was incumbent upon Lionheart to marshal facts, if any existed, establishing either a timely conforming exercise of the option rights or some legally cognizable basis excusing strict

compliance with the 30-day contractual deadline. See *Triple R Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 16 (once the movant satisfies its initial burden of production on summary judgment, the burden shifts to the nonmovant to present a factual basis establishing that the movant is not entitled to judgment as a matter of law or that genuine issues of material fact exist). Lionheart failed to do so. Lionheart does not argue, and the record does not demonstrate, that plaintiff extended or waived the 30-day window or otherwise consented to revive Lionheart's option rights after they expired. Moreover, even if not untimely, Lionheart's subsequent correspondence of December 23, 2016, likewise failed to constitute a conforming exercise of the option rights because that letter likewise did not reflect an unconditional acceptance strictly conforming to the option provisions in the buy-sell agreements. Specifically, it expressly noted that the redemption agreements had been "previously sent" to plaintiff and did not disavow or otherwise withdraw the additional material terms contained therein.

¶ 79    While  summary judgment is a drastic measure and should be allowed only when the right of the moving party is clear and free from doubt (*Purtill*, 111 Ill. 2d at 240), where, as here, the material facts are undisputed and the issue presented concerns the legal effect of those facts under unambiguous contractual provisions, summary judgment is appropriate. See *Olympic Restaurant Corp. v. Bank of Wheaton*, 251 Ill. App. 3d 594, 603 (1993) (affirming summary judgment where dispute turned on interpretation of contractual terms).

¶ 80    In this case, the trial court erred in its rulings on the parties' cross-motions for summary judgment relating to Lionheart's counterclaim for specific performance. Because the undisputed record establishes that Lionheart failed to exercise its option rights in strict conformity with the buy-sell agreements within the contractual 30-day period, plaintiff was entitled to judgment as a matter of law on Lionheart's counterclaim for specific performance. Put simply, Lionheart's option

rights lapsed, resulting in termination of the stock-transfer restrictions applicable to plaintiff, as the affected shareholder, as expressly provided in section 2.4 of the buy-sell agreements.

¶ 81    In light of our determination that Lionheart's option expired unexercised, the trial court likewise erred in entering summary judgment in favor of the individual shareholder defendants and in disposing of plaintiff's claims against Lionheart as alleged in the complaint. The trial court's August 16, 2024, grant of the individual shareholder defendants' motion for summary judgment, as well as its October 10, 2024, ruling that it had adjudicated all of plaintiff's claims against all defendants and its subsequent imposition of a $100-per-day sanction until plaintiff tendered his shares, were predicated on the court's March 20, 2024, ruling granting Lionheart's motion for summary judgment on its counterclaim and ordering plaintiff to tender his shares to Lionheart in exchange for net book value. That premise cannot be sustained. Accordingly, we reverse the trial court's grant of summary judgment in favor of the individual shareholder defendants and its disposition of plaintiff's claims against Lionheart, as well as vacate the civil contempt finding, including the associated $100-per-day sanction and award of $1,900 in attorney fees. See *Schallau v. City of Northlake*, 82 Ill. App. 3d 456, 467-68 (1979) (vacating civil contempt where reversal of original order eliminated coercive purpose).

¶ 82    Although we vacate the civil contempt finding and the resulting sanctions, we do not condone plaintiff's refusal to comply with the trial court's orders of March 20, 2024, and August 16, 2024. It is well settled that one must comply with a court order unless that order is utterly void, and it is no defense in a contempt proceeding to show that the order is merely erroneous. *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 481 (1997). Where a court possesses jurisdiction over the subject matter and the parties to the proceeding, its order must be obeyed until such time as it is set aside by the issuing or reviewing court. *Faris v. Faris*, 35 Ill. 2d 305, 309 (1966). Here,

because there is no dispute that the trial court had jurisdiction over the parties and the subject matter, plaintiff was obligated to comply with the court's orders notwithstanding his disagreement with their correctness. Nevertheless, because we conclude that plaintiff was entitled to judgment as a matter of law on Lionheart's claim for specific performance, the coercive contempt sanction imposed to compel plaintiff's surrender of his shares is unwarranted. Accordingly, we vacate the finding of contempt, the attendant sanctions, and the award of $1,900 in Lionheart's attorney fees.

¶ 83                              C. Denial of Leave to Amend

¶ 84     Plaintiff next contends that the trial court erred in denying his motion for leave to file an amended verified complaint and his motion for leave to file an amended answer containing affirmative defenses to Lionheart's counterclaim.

¶ 85     Under section 2-616(a) of the Code (735 ILCS 5/2-616(a) (West 2022)), at any time before final judgment, the court may permit amendments on just and reasonable terms to introduce any party who ought to have been joined as a defendant, or to change the cause of action or defense, "which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim." Indeed, "trial courts are encouraged to freely and liberally allow the amendment of pleadings, so that a litigant can completely present its cause of action." *Andrade v. City of Kankakee*, 2023 IL App (3d) 230035, ¶ 20. In evaluating whether to allow an amended pleading, courts ordinarily consider four factors: (1) whether the proposed amendment would cure the defective pleading; (2) whether the other parties would be prejudiced or surprised by the proposed amendment; (3) whether the plaintiff had prior opportunities to amend; and (4) whether the proposed amendment is timely. *Muirfield Village-Vernon Hills, LLC v. K. Reinke, Jr. & Co.*, 349 Ill. App. 3d 178, 195-96 (2004). However, a court "may begin and end [its] analysis with the observation that it is never an abuse of discretion to deny leave to amend

when the proposed amendment would be futile." *Malacina v. Cook County Sheriff's Merit Board*, 2021 IL App (1st) 191893, ¶ 40.  The decision to grant or deny leave to amend is a matter within the sound discretion of the trial court.  *Andrade*, 2023 IL App (3d) 230035, ¶ 20.

¶ 86    On the present record, we conclude that reconsideration of plaintiff's motion for leave to file an amended complaint is warranted.  Although plaintiff wished to assert additional claims and add a new defendant, the scope and viability of those claims were not fully developed and, when the trial court denied plaintiff's motion for leave to file an amended complaint, it of course did not have the benefit of our determination that Lionheart's option rights expired unexercised and that plaintiff was entitled to judgment as a matter of law on Lionheart's counterclaim for specific performance.  Because that determination materially alters the posture of this case and may bear upon the viability of plaintiff's proposed amended claims, we remand the matter to the trial court to reconsider plaintiff's motion for leave to file an amended complaint.

¶ 87    With respect to the trial court's denial of plaintiff's motion for leave to file an amended answer and affirmative defenses to Lionheart's counterclaim, because we reverse the judgment entered in favor of Lionheart on its counterclaim for specific performance and hold that plaintiff was entitled to summary judgment on that claim, plaintiff's challenge to the denial of leave to file an amended answer and affirmative defenses is moot.

¶ 88    Accordingly, we determine that the trial court erred in denying plaintiff's cross-motion for summary judgment on Lionheart's counterclaim for specific performance, erred in granting summary judgment in favor of Lionheart on that counterclaim, erred in granting summary judgment in favor of the individual shareholder defendants on plaintiff's complaint, and erred in sanctioning plaintiff and ordering him to pay Lionheart's attorney fees.  We further remand the matter to the trial court for reconsideration of plaintiff's motion for leave to file an amended

complaint in light of our determination that plaintiff was entitled to judgment as a matter of law on Lionheart's counterclaim for specific performance. Based on our resolution, plaintiff's claims that the court abused its discretion in denying his motion to stay enforcement of its order requiring him to surrender his shares to Lionheart and in denying him leave to file an amended answer and affirmative defenses to Lionheart's counterclaim are moot.

¶ 89                                III. CONCLUSION

¶ 90    For the foregoing reasons, we reverse the trial court's denial of plaintiff's cross-motion for summary judgment on Lionheart's counterclaim for specific performance, reverse the court's grants of summary judgment in favor of Lionheart on its counterclaim and the individual shareholder defendants relative to plaintiff's complaint, vacate the trial court's finding of civil contempt, together with the associated sanctions and award of attorney fees, and remand for further proceedings.

¶ 91    Reversed in part and vacated in part.

¶ 92    Cause remanded.